NATIONAL BANK OF CANADA, Plaintiff,

v.

INTERBANK CARD ASSOCIATION, a Delaware Membership Corporation, and Bank of Montreal, Defendants.

No. 80 Civ. 6461 (LBS).

United States District Court, S. D. New York.

Dec. 9, 1980.

Donovan, Leisure, Newton & Irvine, New York City, for plaintiff by Walter L. Stratton, David S. Versfelt, G. Russell Miller, New York City, of counsel.

Rogers, Hoge & Hills, New York City, for defendant Interbank by Frank H. Gordon, Thomas Junker, New York City, of counsel.

Covington & Burling, by Harry Shniderman, Bingham Leverich, Arvid Roach, Washington, D. C., of counsel.

Sullivan & Cromwell, New York City, for defendant Bank of Montreal by John Dickey, William M. Dallas, Jr., Daniel C. Caldwell, New York City, of counsel.

## DECISION OF THE COURT

SAND, District Judge.

THE COURT: This controversy initially came before the Court when plaintiff, National Bank of Canada ("National Bank"), a chartered Canadian bank, sought a temporary restraining order and preliminary injunction restraining defendants Interbank Card Association ("Interbank"), a not-for-profit Delaware membership corporation, and Bank of Montreal ("BOM"), a chartered Canadian Bank, "from terminating or otherwise interfering with the present course of plaintiff's 'Master Charge' bank credit business." Order to Show Cause, ¶ 1, November 17, 1980.

On November 19, 1980, the parties agreed pursuant to FRCP 65(a)(2) to a consolidation of the hearing on the application for a preliminary injunction with the trial of the action on the merits. This action was taken after it became apparent that it was not possible to maintain the status quo without significantly advantaging or prejudicing one of the two competing bank parties. It further appeared that the action sought to be enjoined would have affected some 440,000 of plaintiff's Master Charge cardholders and the accounts of some 28,000 merchants. See Affidavit of Walter L. Stratton in support of plaintiff's application, ¶ 2.[1]

Expedited discovery was conducted and trial to the Court commenced on December 4, 1980.

Plaintiff has completed its proof and defendants have moved pursuant to Fed.R. Civ.P. 41(b) for dismissal of the action on the merits on the ground that plaintiff has shown no right to relief. For the reasons set forth herein, the motion to dismiss is granted and this opinion shall constitute the Court's findings pursuant to Fed.R.Civ.P. 52(a).

*The Facts*

As noted, this controversy arises among two Canadian chartered banks and Interbank, the Delaware membership corporation which owns and, in conjunction with its members, operates the Master Charge bank credit card system. To understand the nature of the controversy and the contentions of the parties, it is necessary to trace the history of Master Charge in Canada beginning in 1972. What will be readily apparent from even the briefest description of the situation which then obtained in Canada with respect to the size, number and operations of Canadian banks and the absence in Canada of duality (a term which we define *infra* at page 1118) is that it presents a picture far different from that presented in the United States. For example, in all of

---

1. The diligence of counsel for all parties in preparing this important case for trial in so short a time and in furnishing the Court with copies of exhibits, depositions and excellent briefs, has been extraordinary and the Court expresses its appreciation to counsel. In like spirit we have endeavored to deal with the issues with a recognition of the time pressures present here.

Canada there are not more than eleven chartered banks as contrasted to the multitude of American banking institutions.

In 1972 the "VISA/Chargex" bank credit card (then known as "Bank Americard" but for convenience referred to as "VISA" throughout this opinion) was the only bank credit card in Canada,[2] having been inaugurated in 1968 by four of the six largest banks in Canada (Royal Bank of Canada, Canadian Imperial Bank of Commerce, Toronto Dominion Bank, Banque Canadienne Nationale). The Bank of Nova Scotia, the fifth largest bank, was scheduled to become a VISA bank in 1972.

At this time BOM was the only bank with nationwide operations not in the VISA system. Another bank not in VISA was the Provincial Bank of Canada ("Provincial Bank"). Plaintiff National Bank has resulted from the amalgamation of the two banks formerly known as Provincial Bank of Canada and Banque Canadienne Nationale ("BCN").

Both Provincial and BOM considered the bank credit card market. The alternatives open to them were either to join the existing and established VISA system or a new credit card system. Upon inquiry, both banks were advised that substantial fees would be required to join the VISA system, (Cdn.) $12,000,000 for BOM and (Cdn.) $5,000,000 for Provincial. They elected instead to explore the development of a Master Charge system in Canada.

In November, 1972, BOM and Provincial formed a "Joint Charge Card Steering Committee" to coordinate their negotiations with Interbank. This Committee met before the negotiations with Interbank began and there was agreement that BOM and Provincial should seek exclusivity for a suf-

ficient period of time to allow development of the market, achievement of operational stability, and recovery of initial and ongoing investment before other entities were permitted to freely enter the system without sharing in the startup costs. Exclusivity was an important factor in the negotiations and after bargaining, the identical license agreements signed by BOM and Provincial Bank on February 20, 1973, contained a modified eight-year exclusivity provision. This period coincided with projections that the (Cdn.) $8,000,000 startup costs would be recovered in eight years. In the first exclusivity period the consent of both BOM and Provincial Bank was required for the grant of a license to any Canadian entity. In the next period an exception to the consent requirement allowed entry into the system of Canadian entities owned or controlled by United States entities without such consent. In the final period a proviso was added that BOM and Provincial may not withhold their consent to the grant of licenses to Canadian entities,[3] seeking admission to the system on reasonable and non-discriminatory terms, subject to a right to payment of a reasonable share of startup costs. The exclusivity provisions are set out in full in Appendix A.

The license agreement also contained the following provision: "10. Non-assignment period. Licensee may not sublicense or assign its rights hereunder." This provision differs from the non-assignment provision contained in some of Interbank's other agreements in that it deletes an exception sometimes contained in such agreements for transfers to entities who succeed to the business and assets of the licensee.[4] The omission of such a provision would appear

---

**2.** The bank credit card is of course distinguishable from the convenience or travel and entertainment cards such as American Express, Diners Club or Carte Blanche which do not entail the extension of credit as a primary aspect of the operation of those credit card systems.

**3.** None of the exclusivity periods restrained entry into the system by entities other than Canadian entities.

**4.** For example, the Greek license contained the following provision: "Licensee may not sublicense or assign its rights hereunder, except that this license may be transferred to any institution which succeeds to all or substantially all of the business or assets of Licensee and which, at the time of such transfer, is a member of Licensor or any affiliate of a member of Licensor."

to be indicative of an intent of the parties that the licenses granted to BOM and Provincial Bank could not be transferred to a successor entity in this fashion.[5]

Commencing in 1973, BOM and Provincial entered into a relationship embodying elements of both cooperation and competition. They developed and sponsored a general advertising program, a computer link between the two banks for processing transactions of each other's cardholders, a joint committee for developing the Master Charge program and a warning bulletin for lost or stolen cards, among other cooperative activities. On the other hand, after an initial three-month joint solicitation effort, they competed vigorously, and were intended to compete vigorously, for cardholders and merchant accounts in terms of convenience services, floor limits[6] and discount rates. Both BOM and Provincial exceeded the goals for cardholders and merchants which had been set in the license agreement with Interbank as a condition to the exclusivity provisions. Intense competition continues both between the VISA and Master Charge systems and between the members of each system.

Additionally, BOM has signed or is in the process of signing four affiliate banks. The payments made to date by affiliates have been divided by agreement in the proportion of 76 percent to BOM and 24 percent to Provincial based approximately on the relative portion of startup costs borne by each of the banks.

*The Bank Credit Card*

The use of credit cards has become so prevalent in our society that detailed findings with respect to how they operate seem unnecessary. Some aspects peculiar to bank credit card systems and the interrelationships of the parties in the functioning of the system have significance for jurisdictional purposes and with respect to the merits of this controversy and we discuss them briefly herein.

The bank credit card is a tripartite arrangement, the first element of which is the agreement between the bank that issues a credit card and the cardholder. The second agreement is the one between the bank and the merchant and the third is the sales agreement between the merchant and the cardholder in the purchase of a product or service.

The issuer bank establishes an account on behalf of the person to whom the card is issued and enters into an agreement which governs that relationship and which, among other things, establishes a line of credit under which the cardholder may incur obligations to the bank by a cash advance or through a purchase of goods or services from a merchant honoring the card.

The merchants also have an agreement with the so-called merchantbank requiring them to honor all valid Master Charge credit cards issued by all member banks and enabling them to deposit slips evidencing all sales to cardholders in an account at the bank in return for a discounted credit to the merchants' accounts at that bank. These deposit slips are then cleared and forwarded through an interchange system to the member bank which originally issued the card, which bank periodically bills the cardholder. The individual cardholder must then decide whether to make payment in full within the specified period free of finance charges (thus using the card solely as a convenience in the fashion of the travel and entertain-

---

5. A related section of the Interbank bylaws (Article I, Section 8) as of July 7, 1980 provides: "Transferability of Membership. Membership in this corporation is not transferable of assignable whether by sale, consolidation, merger, operation of law or otherwise, except as the board of directors may expressly permit."

The phrase "by operation of law" was added to the bylaws after BOM and Provincial joined the system. Interbank emphasizes that its sys-

tem operates not only in the United States but in 60 foreign countries and that the language utilized in this bylaw was intended to encompass the various ways by which transfer or assignment could be effected under the corporate laws governing each of its members.

6. The floor limit is the amount a retailer may permit a credit holder to purchase without specific authorization from the bank.

ment cards) or to defer payment and ultimately to be charged an additional percentage of the amount billed.

The card issuing bank takes all of the credit risk and the cardholder selects the merchant with whom he will deal. Many merchants accept more than one bank credit card as well as the credit cards of the convenience credit card systems. In Canada, of those merchants that accept bank credit cards, between 75 and 80 percent accept more than one credit card.

## THE INTERBANK SYSTEM

Interbank does not play any part in determining merchant discount rates or interest rates charged to cardholders. Interbank licenses its trade and service marks, and provides clearance mechanisms for the exchange of billing data for Master Charge transactions between its member banks and for credit authorizations and verifications for Master Charge transactions made by customers of Interbank's members.

In order to perform these functions, Interbank has established two electronic clearing house systems: the Interbank Network for Electronic Transfers ("INET") and the Interbank National Authorization System ("INAS"). (VISA maintains an entirely independent clearing house system.)

INET is a centralized telecommunication system operated by Interbank in St. Louis, Missouri for the exchange of some billing data between Interbank members when, not cleared directly, such as in Canada, or through local or regional clearing houses. Billing data acquired by a member from its merchants is transmitted to Interbank in St. Louis via the INET system. Upon receipt in St. Louis the data is checked for corrections, sorted and transmitted to the appropriate card issuing members for billing to their customers. As Mr. Harel, an executive of plaintiff bank, described this procedure: "The computers talk to each other."

In addition, INET is used by international Interbank members to settle transactions and exchange paper with United States Interbank members through correspondent banks in the United States.

INAS is likewise a centralized telecommunications system operated by Interbank in St. Louis for the processing of Master Charge authorization requests, when more than one bank is involved and where authorizations are not made directly by the bank involved or by local or other authorization centers. Merchants are in contact with their bank which uses the system to obtain authorizations for card transactions above certain limits by making a request to Interbank's central processing unit in St. Louis. This unit immediately routes the request to the appropriate card issuing member and the issuing member will then either authorize the transaction, reject it or indicate that voice contact is required to complete the transaction.

Access to the INET and INAS systems is available to all Interbank members if they wish to use the systems, and indeed is essential to the operation. The purpose of the INET and INAS systems is to facilitate the operation of the Master Charge system and to protect Interbank members from unauthorized or improper credit card use.

Other cooperative efforts among Interbank members include reporting lost or stolen credit cards which are listed in "warning bulletins" periodically sent to merchants. Each bank decides for itself which cards are to be listed in warning bulletins and which of its merchant accounts is to receive such bulletins. These bulletins, colloquially referred to as "hot card lists", include member banks in the United States and Canada.

## DUALITY

The term "duality" as used in this proceeding has reference to the membership by a single bank in both the VISA and Master Charge systems. Duality is the prevalent practice today in the United States, but except for the plaintiff, which is the result of an amalgamation of a VISA member bank and a Master Charge member bank, no Canadian bank is a dual bank insofar as these two systems are concerned.

Duality has obvious advantages to the merchant. With duality he need deposit his Master Charge and VISA sales slips in only one, not two different banks. With duality he can combine his Master Charge and VISA accounts in one bank which is not only a convenience, but which will increase his bargaining position with the bank vis-a-vis discount rates and other matters negotiated with the bank.

The pros and cons of duality are a matter of bona fide disagreement among bankers in many respects, including disagreement as to whether duality will in the long run further or inhibit competition between VISA and Master Charge. We need not at this juncture take a position on whether duality is a bane or a blessing to the bank credit card industry. Suffice it to say that duality significantly affects the relationship and that a bank which can offer a merchant the full advantages of duality has distinct competitive advantages over a bank which is in only one system.[7]

### THE EVENTS LEADING TO THE PRESENT CONTROVERSY

In July 1979 Provincial and BCN announced plans to amalgamate, which were effective November 1, 1979 and resulted in the formation of National Bank. Interbank was advised of the amalgamation before its effective date. Interbank took the position that under the license agreement and Section 8 of the Interbank bylaws, Provincial's license was not transferable, and that to continue to issue Master Charge cards and enter into merchant agreements, National Bank would be required to apply for a new license. Under the exclusivity provisions, BOM's consent would be required for issuance of the new license. BOM had already informed Provincial that it would consider consenting to a license for National Bank if it disposed of the VISA operation. National Bank attempted to sell its VISA operations but was unsuccessful. In the meantime, Interbank, with Bank of

Montreal's consent, issued a sixty day interim license to National Bank, effective November 1, 1979, and National Bank entered an agreement with the Canadian Bank Card Association (an organization of Canadian VISA banks) that it would keep its VISA and Master Charge operations separate and distinct from each other. The Master Charge interim license expired on January 1, 1980, but no action to terminate National Bank's Master Charge operations was taken until August, 1980. National Bank thus functioned as the only "dual" bank in Canada in that it offered both Master Charge and VISA, albeit as noted that it has by virtue of its agreement with the VISA banks restricted itself with respect to the extent to which it could take advantage of this dual position.

In August, 1980 the Interbank board of directors passed a resolution terminating Provincial's license effective November 21, 1980. The resolution is set out in full in Appendix B hereto.

### SUBJECT MATTER JURISDICTION

Plaintiff National Bank alleges subject matter jurisdiction under the proscription in Section 1 of the Sherman Act of conspiracies in restraint of interstate or foreign commerce of the United States, 15 U.S.C. § 1. The defendants respond that there is an insufficient effect on United States commerce to justify extraterritorial application of the Sherman Act and that international comity requires this Court to decline jurisdiction.

The parties are in agreement that the applicable criteria are provided by *Timberlane Lumber Company v. Bank of America*, 549 F.2d 597 (9th Cir. 1976).

In *Timberlane* the Ninth Circuit adopted a three-part test for extraterritorial application of the Sherman Act:

"[1] Does the alleged restraint affect, or was it intended to affect, the foreign

---

7. Here plaintiff has agreed as an interim measure relating to litigation commenced by VISA banks and relating to its VISA operations, which litigation is pending in the Canadian

courts, to refrain from some of the activities which create this competitive advantage, e. g., pooling accounts, personnel, joint advertising, etc.

commerce of the United States? [2] Is it of such a type and magnitude as to be cognizable as a violation of the Sherman Act? [3] As a matter of international comity and fairness should the extraterritorial jurisdiction of the United States be asserted to cover it?"

*Timberlane, supra* at 615.[8]

The *Timberlane* approach has been followed by one court in this district. *See Dominicus Americana Bohio v. Gulf & Western Industries, Inc.*, 473 F.Supp. 680, 687–88 (S.D.N.Y.1979). In *Bohio*, the court first required an "effect on foreign commerce [which need not] be both substantial and direct so long as it is not *de minimus*," and then took international comity into account and applied a "balancing test that weighs the impact of foreign conduct on United States commerce against the potential international repercussions of asserting jurisdiction." *Id.* at 688. *See Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 428 (9th Cir. 1977) (clarifying *Timber-*

lane : "although foreign activities must of course have *some* effect on United States foreign commerce before they can be reached, we disagree with the district court's requirement that the effect must be substantial.").

█ We find the standards set forth in *Timberlane* and *Bohio* applicable to the instant case, and conclude that this court has jurisdiction over the plaintiff's Sherman Act claims, and that we should not abstain on grounds of international comity.[9]

First, the restraints alleged by plaintiff have some effect on the foreign commerce of the United States. Interbank is an American company. Plaintiff alleges that Interbank has acted jointly with BOM's major Canadian Master Charge competitor. In addition to the effects of the alleged restraints on the continuous use of Master Charge cards in the United States and Canada by cardholders who cross the border,[10]

---

**8.** In *Timberlane*, the Court also stated the three tests as follows:

"[T]he Antitrust laws require, in the first instance that there be *some* effect—actual or intended—on American foreign commerce before the Federal Courts may legitimately exercise subject matter jurisdiction under these statutes. Second, a greater showing of burden or restraint may be necessary to demonstrate that the effect is sufficiently large to present a cognizable injury to the plaintiffs and, therefore, a civil *violation* of the antitrust laws. . . . Third, there is an additional question which is unique to the international setting of whether the interests of, and links to the United States—including the magnitude of the effect on American foreign commerce—are sufficiently strong vis-á-vis those of other nations, to justify an assertion of extraterritorial authority."

*Id.* at 613 (citations omitted) (emphasis in original).

Finally, the court pointed to the following factors to be considered with respect to international comity:

"[T]he degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or effect American commerce, the foreseeability

of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad."

*Id.* at 614 (footnote omitted). *See also Mannington Mills v. Congoleum Corporation*, 595 F.2d 1287, 1297–98 (3d Cir. 1979) (listing ten factors).

**9.** *See In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1255 (7th Cir. 1980) ("The clear thrust of the *Timberlane* court is that once a district judge has determined that he has jurisdiction, he should consider additional factors to determine whether the exercise of that jurisdiction is appropriate.") (footnote omitted).

**10.** In the twelve-month period November 1979 through October 1980 merchants in the United States accepted Master Charge cards issued in Canada as payment for goods and services in more than 3,013,274 transactions for a total of more than (Cdn.) $178,000,000 in goods and services. Master Charge cards issued by Bank of Montreal were used in approximately 2,713,-274 of these transactions for a total of (Cdn.) $162,983,508, and Master Charge cards issued by National Bank were used in approximately 300,000 of these transactions for a total of approximately (Cdn.) $17,000,000 (Tr. 108.).

In the same twelve-month period merchants in Canada accepted Master Charge cards issued in the United States in payment for goods and services in more than 1,736,654 transac-

on the clearing activities of the various United States banks in the Interbank system,[11] and on the continuous flow of communications between the United States and Canada through the INET and INAS computer operations, the invalidation of the alleged restraints would have affected the ability of Interbank to enter the Canadian credit card market in the first instance, bearing in mind its position with respect to the VISA system, and the fact that no bank credit card has over any sustained period of time been profitable, and will affect its ability to enter other such markets in the future. Interbank's entry into the Canadian bank credit card market is clearly foreign commerce of the United States within the meaning of the Sherman Act, and the other effects noted above which have accompanied such entry are also sufficient to invoke the Sherman Act. *See Timberlane, supra; Bohio, supra.* For many significant purposes, the Canadian bank credit system of Master Charge is fully integrated into the United States system.

Second, if the invalidity of the alleged restraints were supported by the evidence, the injury to plaintiff would be sufficient to present a cognizable Sherman Act claim: plaintiff would be excluded from the Canadian market based on the conspiracy between Interbank and BOM. *See Timberlane, supra* at 613.

Finally, international comity does not call for abstention. Defendants allege that the status of Provincial Bank and BOM as Canadian banks weighs against exercise of this Court's jurisdiction. This argument ignores the fact that Interbank, which plaintiff alleges was a participant in the violations of the Sherman Act, is a United States company and that there are enough effects on the foreign commerce of the United States to invoke extraterritorial ap-

plication of the Sherman Act. Defendants also point out that the effects in Canada are greater than those in the United States. However, although this may be a factor in our consideration, there is no requirement that the effects in the United States predominate; the requirement is that there be some effect on the foreign commerce of the United States. *See Timberlane, supra* at 613.

Lastly, defendants argue that this Court should decline jurisdiction because of a potential conflict with Canada if American authority is asserted. Defendants argue that this potential conflict arises from plaintiff's invocation of the Sherman Act to void an agreement that prevents National Bank from being a "dual" bank, while a similar suit challenging the validity of the prohibition of duality in the CBCA bylaws is pending in the Supreme Court of Ontario in the suit commenced by two Canadian VISA banks against National Bank. This argument is unpersuasive. As plaintiff has stated, it challenges in this suit the actions of Interbank and BOM which it alleges are restraints of trade in violation of the Sherman Act, and which would have the effect of eliminating BOM's only Master Charge competitor from the market. It does not, in this action, raise the question whether a prohibition of duality, by itself, would be a violation of the Sherman Act or of Canadian law. Rather, plaintiff challenges the interpretation of its license agreement and the Interbank bylaws (which defendants assert are governed by New York and Delaware law respectively) to exclude it from the market and destroy its competitive advantages. This claim presents no conflict with the VISA lawsuit in Canada and we therefore will not decline jurisdiction based on international comity.

tions for a total in excess of (Cdn.) $69,854,602. Bank of Montreal merchants accepted "Master Charge" cards issued by banks in the United States in approximately 1,336,854 transactions for a total of approximately (Cdn.) $59,854,602. (Tr. 106.). National Bank merchants accepted Master Charge cards issued by banks in the United States in more than 400,000 transac-

tions for a total of more than (Cdn.) $10,000,-000. (Tr. 105.).

11. Whenever a Master Charge transaction is entered in the United States by a Canadian cardholder, the transaction must be cleared through the Manufacturers Hanover Trust Company in New York, which debits or credits the accounts of the appropriate banks.

## SHERMAN ACT CLAIMS

### 1. Per se Violations

As noted *supra*, plaintiff challenges the license agreements and Interbank bylaws as interpreted by the defendants on the ground that they constitute group boycotts, or concerted refusals to deal which are per se violations of Section 1 of the Sherman Act. We are not convinced that the courts have had sufficient experience with the challenged arrangements in the bank credit card industry *in Canada* to conclude that they are subject to a presumption of having a "pernicious effect on competition and lack of any redeeming virtue." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979), especially "where the initial purpose in forming the joint venture, to produce a national credit card, is obviously not illegal." *Worthen Bank & Trust Co. v. National Bankamericard Inc.*, 485 F.2d 119, 130 (6th Cir. 1973) *cert. denied* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974).[12]

██ We thus reject plaintiff's claims that the license agreement and bylaws as interpreted by defendants may be conclusively presumed under the per se rules to be unreasonable restraints of trade. We therefore turn next to analysis of the license agreements and bylaws under the rule of reason. *See Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.) (remanding for new trial under rule of reason after jury verdict based on *per se* instructions) *cert. denied* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).[13]

### 2. Rule of Reason

██ Our inquiry under the rule of reason is "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) (*quoting Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918)). To make this judgment, as finder of the facts, the Court weighs the particular circumstances of the case, including the facts peculiar to the industry involved, the history of the restraint, and the reasons for adopting it, among other factors. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 & n.15, 97 S.Ct. 2549, 2557 & n.15, 53 L.Ed.2d 568 (1977) (*quoting Chicago Board of Trade, supra* at 238, 38 S.Ct. at 243). In other words, we must weigh the competitive evils of the restraint against the competitive benefits asserted on its behalf. *Gough v. Rossmoor Corp.*, 585 F.2d 381, 388–89 (9th Cir. 1978) *cert. denied* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); *Oreck Corp. v. Whirlpool Corp., supra* 579 F.2d at 131–32 n.6.

██ The exclusivity provisions challenged by plaintiff were adopted at the time of Master Charge's initial entry, through Provincial Bank and BOM, into the Canadian credit card market. At that time the VISA system was well established in Canada and all parties recognized that a major investment would be needed to compete with the VISA system in attracting cardholders and merchants. Interbank was aware that because of the small number of chartered banks in Canada and the fact that the five largest banks were already members of the VISA system, BOM may have been the last bank available to it with a national scope of operations. In this context, to encourage BOM and Provincial

---

12. *Worthen* was remanded for trial under the rule of reason. *See* 485 F.2d at 129–30, but the case was never tried on the merits after remand. *Fisher v. First National Bank of Omaha*, 548 F.2d 255, 261 n. 6 (8th Cir. 1977).

13. Defendants' arguments that plaintiff's allegations of per se violations preclude assertion of rule of reason claims are without merit.

When the conclusive presumption of unreasonableness embodied in the per se rule does not apply to a particular practice, the appropriate inquiry is whether the practice is unreasonable. In any event, defendants have not been prejudiced by any shift in emphasis from the per se rule to the rule of reason.

Bank to establish a Master Charge system in Canada and to protect those banks' investment in the new system, Interbank agreed to the exclusivity provisions described above. In accordance with projections of an eight-year period for recovery of startup costs, an eight-year period of exclusivity (with the exceptions noted *supra*) was adopted, with a right on behalf of BOM and Provincial Bank to be reimbursed a proportion of the startup costs by any new licensees during the eight-year period of exclusivity.

The primary underlying purpose of the exclusivity provision was to enhance competition in the Canadian credit card market by introducing a new product, Master Charge. While it restricted intrabrand competition to some extent, it had the beneficial effect of increasing interbrand competition which provides a "significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." *Continental T.V., Inc. v. GTE Sylvania, supra* at 52 n.19, 97 S.Ct. at 2558 n.19, 53 L.Ed.2d 568; *Oreck Corp. v. Whirlpool Corp., supra* at 130 n.5. Therefore, in light of its moderate length (determined based on economic projections of startup cost recovery), and its reasonableness under the circumstances of the industry, the exclusivity provision in Canada, limited as it was to restraints on Canadian entities, was not violative of Section 1 of the Sherman Act. *See Continental T.V., Inc. v. GTE Sylvania, Inc., supra* at 55, 97 S.Ct. at 2560 ("[m]anufacturers entering new markets can use [vertical] restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer."); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1030 (2nd Cir.) ("[A] manufacturer is free to choose the type of mechanism through which he will distribute his goods and can designate certain sales representatives as his exclusive agents.") *cert. denied* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). *Denison Mattress Factory v. Spring-Air Company*, 308 F.2d 403, 408 (5th Cir. 1962) (exclusive trademark license does not violate the Sherman Act if the primary purpose is to protect the licensee in the fruits of his labor and is based on legitimate business justifications).

■ Plaintiff argues that this is a horizontal, not a vertical restraint and that BOM, with which it competes directly is "pulling the strings" to effect, through Interbank, a horizontal restraint. However, one must examine the relationship among the parties in the light of the history of the industry and the purpose of the arrangements.[14] Viewed in this light, the arrangements adopted were designed to enable Interbank to enter the Canadian market and establish a distribution system for its product, the Master Charge card. Moreover, we find no evidence of any surreptitious control by BOM over Interbank or any covert conspiratorial dealings between Interbank and BOM directed against plaintiff. Finally, the requirement of consent of BOM and Provincial Bank to grant of new licenses during the exclusivity period was reasonable in light of the substantial investments which the two banks were making in the Master Charge system in an attempt to compete with VISA.

We therefore conclude that plaintiff fails to state a claim of violation of Section 1 of the Sherman Act under the rule of reason.[15]

*Contract Claims*

Plaintiff's contract claims raise the question whether the "amalgamation" under Section 100 of the Canadian Bank Act of Provincial Bank and BCN to constitute National Bank constituted an assignment pro-

---

**14.** Nothing subsequent to the adoption of these arrangements renders them now unreasonable.

**15.** Having found that the challenged provisions are not violative of the Sherman Act under the per se rule or the rule of reason, we need not reach defendants' alternative argument that plaintiff is barred from relief by the *in pari delicto* doctrine and therefore do not consider whether or not that doctrine is applicable to this or any other case brought under the Sherman Act.

hibited by Section 10 of the license agreement or Section 8 of the Interbank bylaws, thereby justifying termination of the license agreement and Provincial Bank's membership in Interbank.

The parties are in agreement that New York law governs interpretation of the license contract based on the choice of law provision contained therein. Under *Klaxon Co. v. Stenton Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), we apply the choice of law rules of New York, the state in which we sit, and we find that, under either the significant contacts test or the reasonable relationship test, New York courts would apply New York law, in accordance with the intent of the parties. *See LaBeach v. Beatrice Foods Co.*, 461 F.Supp. 152, 155–56 (S.D.N.Y.1978). Similarly it is clear that Interbank's bylaws are to be interpreted in accordance with Delaware law. It would create an intolerable situation if the bylaws of this membership corporation were subject to varying interpretations based on the situs of individual members. Moreover, we find, and plaintiff and defendants agree, that the basic question in interpreting the non-assignment provision and the bylaw is whether the parties intended the provision to avoid the result of the amalgamation.[16]

We find in the non-assignment provision and the bylaws the manifestation of an intent by the parties to deny efficacy to a change such as that which resulted from the amalgamation of Provincial Bank and BCN. In 1973 BOM and Provincial Bank were entering into a limited joint venture and their intent was to protect their initial investment by providing a period of exclusivity which would give them a marketable asset in the form of affiliate agreements which they could thereafter sell and recoup some or all of their initial startup costs.

The instant case is entirely unlike *Regina v. Black & Decker Manufacturing Co.*, 43 D.L.R.(3d) 393 (Sup.Ct.Can.1974) relied on by plaintiff, in which the Supreme Court of Canada held that a corporation which had amalgamated with another corporation under a provision of the Canada Corporations Act (now Section 137 of R.S.C.1970, c. C–32) identical to Section 100 of the Canadian Bank Act "continued" in existence for the purpose of imposition of criminal liability for a price fixing violation of the constituent corporation. Of course, amalgamation will not permit escape from liabilities previously incurred by one of the amalgamators, but in the instant case the question is whether the parties intended to allow the type of change which has occurred through the amalgamation without the consent of BOM and Interbank. The "metaphysics" of the Canadian Bank Act do not alter the fact that unless defendants are permitted to enforce the non-assignability provisions in the license and bylaws, National Bank with its vast array of offices and $9.6 billion in assets which was not a Master Charge licensee or an Interbank member before the amalgamation, would now be a Master Charge member and licensee. This result is clearly what the parties intended the license provision to prohibit. We note again that the license provision omitted a provision elsewhere utilized by Interbank in its license agreements, allowing the effectiveness of transfers of licenses through amalgamation or merger.

The bylaw is, we find, an attempt to cover in broad and general language the diverse legal systems of the 60 countries in which Interbank marks are licensed. The bylaw listed the common permutations of the concepts of merger and acquisitions among other assignments which are proscribed. Thus, under the terms of the contract and the bylaw, Provincial's Master Charge license and membership in Interbank were subject to termination as of the date of the amalgamation, November 1, 1979.

16. Plaintiff's expert witness on Canadian law testified that a clear intention would be required by the Canadian courts to overcome the concept of "continuity" included in Section 100 of the Canadian Bank Act. This requirement would not alter our disposition of this claim because we find the intention of the parties is sufficiently clear.

Plaintiff called to the Court's attention the fact that Provincial Bank had been the subject of an earlier smaller amalgamation and plaintiff's witness, Mr. Harel, stated that this had been called to the attention of Interbank's representative, Mr. Flynn, and that Interbank had not raised any objection. This amalgamation, which involved a relatively small bank, is hardly comparable to the amalgamation of the Provincial Bank having approximately $6 billion in assets, with BCN, which had approximately $9.5 billion in assets. In any event, Mr. Harel stated that Provincial Bank had not relied on this prior history and there thus can be no claim that Interbank waived the license provision or the bylaw or that Interbank is estopped from enforcing these provisions by virtue of this prior experience.

We therefore reject plaintiff's contention that injunctive relief is appropriate to prevent termination of its license and membership in Interbank.

### Denial of Application for New License

■ Plaintiff also asserts that to the extent a new license is required, bylaw Article I, Section 2(d) prohibits denial of its application based on competition between it, as applicant, and BOM, as existing member, or based on its membership in VISA. However, plaintiff overlooks Article I, Section 2(e) which gives the board of directors discretion with respect to applications of international members and creates an exception in those cases from the other requirements of Article I, Section 2. Thus, the Interbank board had the authority to deny National Bank's application based on BOM's determination not to consent to the new license. BOM, in turn, is free to withhold its consent without limitation as to reason pursuant to the exclusivity provisions of the license agreement. It is not until the third time period, from January 1, 1982 to December 31, 1984, that BOM may not withhold its consent from any Canadian entity applying for a license on reasonable and non-discriminatory terms, subject only to a right of BOM to reimbursement of a reasonable share of startup costs. The par-

ties clearly intended this result and, as determined *supra*, the exclusivity agreement and its requirement of consent by BOM and Provincial Bank were valid devices for encouraging those banks to undertake the risks and expenses needed to introduce interbrand competition in Canada by developing a Master Charge system.

### Tort Claims

■ No evidence has been introduced to support plaintiff's claim of tortious interference (Complaint ¶¶ 74–79) and it is therefore dismissed. Moreover, to the extent plaintiff's claim of breach of fiduciary duty owed by BOM to Provincial Bank as a joint venturer is asserted, we find that BOM's refusal to consent, based on opposition to duality and to dilution of the mark which would decrease or hinder the sale of affiliate agreements, was reasonable.

### Conclusion

For the reasons stated herein, we find that plaintiff has failed to demonstrate any right to relief and we therefore grant defendants' motions to dismiss. The Court will maintain jurisdiction over the action and a conference will be held on Friday, December 12, 1980, at 9:30, to discuss remedies, stays and any other questions relating to relief or timing, the counterclaims asserted by Interbank and any other pertinent matters left unresolved by the aforesaid determinations.

### APPENDIX A

*3. Condition on Grant of Other Licenses*

Licensor shall grant no license authorizing use of the Marks to any bank, financial institution, corporation, or other entity or person (hereafter in this section 3 referred to as a "Person") unless and until such Person shall have consented to the making of arrangements acceptable to Licensor with other licensees operating in its service area, including Licensee, with respect to the provisions of clauses (i) and (iv) of section 2 hereof, and Licensee agrees to use its best efforts to make the arrangements contemplated by this paragraph with any such other licensees.

Licensor further agrees, but only upon the condition that the "Charge Card Business Goals" described below shall at all times be complied with, that

(i) prior to January 1, 1978, Licensor will not, without the consent of the Licensee, grant to any Person which is organized under the laws of, or whose Charge Card Business is principally conducted in, Canada or any province thereof (hereinafter in this section 3 referred to as a "Canadian Person") a license to use the Marks in the Charge Card Business within Canada or any part thereof;

(ii) subsequent to December 31, 1977, and prior to January 1, 1982, Licensor will not, without the consent of the Licensee, grant to any Canadian Person a license to use the Marks in the Charge Card Business within Canada or any part thereof, other than a Canadian Person owned or controlled by one or more Persons organized under the laws of the United States of America or any state thereof including the District of Columbia; and

(iii) subsequent to December 31, 1981, and prior to January 1, 1985, Licensor will not, without the consent of the Licensee, grant to any Canadian Person a license to use the Marks in the Charge Card Business within Canada or any part thereof, except as provided in clause (ii) above, provided, however, that the Licensee shall not withhold its consent to the grant of a license to a Canadian Person desiring to be admitted to participation on reasonable and non-discriminatory financial and other terms in the Charge Card Business then being conducted in Canada in connection with which the Marks are used, including payment to the Licensee of a reasonable share of the setting up, organizational and advertising expenses incurred by the Licensee which such Canadian Person may use or from which it may benefit. In the event consent to participation on such terms is withheld the provisions of this clause (iii) shall not prevent issuance of a license to such Canadian Person.

It is understood and agreed that the foregoing provisions do not prohibit or restrict the right of licensees of the Marks other than Canadian Persons to use the Marks in connection with the conduct of the Charge Card Business in Canada to such extent as may be permitted by Canadian law, nor prohibit Licensor from registering such licensees as registered users of the Marks in according with the Canadian Trade Marks Act, nor shall the foregoing prohibit or restrict the use of the Marks by Licensor in Canada. It is also understood and agreed that the foregoing provisions have no application to the grant of Licensor of a license to use the Marks being made by separate agreement of this date containing similar terms and conditions with the Bank of Montreal.

The "Charge Card Business Goals" referred to above are the following:

On or before the dates indicated below and thereafter Licensee and the Bank of Montreal shall have entered into and have in force, in the aggregate, merchant agreements obligating such merchants to accept all properly presented charge cards bearing the Marks with merchants representing not less than the indicated number of merchant outlets in Canada (exclusive of gasoline filling stations), and shall have issued to residents of Canada and have outstanding thereafter, in the aggregate not less than the indicated number of charge cards bearing the Marks:

| Date | Merchant Outlets | Charge Cards |
|------|------------------|--------------|
| September 1, 1974 | 12,700 | 254,000 |
| September 1, 1975 | 25,400 | 381,000 |
| September 1, 1976 | 31,750 | 444,500 |
| September 1, 1977 | 35,000 | 477,000 |
| September 1, 1978 | 38,250 | 509,500 |

Licensee will use its best efforts to further increase such number of merchant outlets.

## APPENDIX B

RESOLUTIONS OF INTERBANK BOARD OF DIRECTORS CONCERNING THE NATIONAL BANK OF CANADA MATTER

RESOLVED that, after consideration of the advice of counsel, it be declared to be

the position of Interbank with respect to the use of National Bank of Canada ("National Bank") of the service marks and trademarks (the "Marks") of Interbank that

(i) Inasmuch as neither the license granted to The Provincial Bank of Canada ("Provincial Bank") pursuant to the License Agreement between Interbank and Provincial Bank dated as of February 20, 1973, nor the membership of Provincial Bank in Interbank, was subject to transfer or assignment by way of amalgamation or otherwise, National Bank has not succeeded to, and does not now own or possess, such license or membership by virtue of the amalgamation or Provincial Bank and Banque Canadienne Nationale to form National Bank effective November 1, 1979, nor does National Bank presently own or possess any other license form, or membership in, Interbank:

(ii) National Bank is not lawfully authorized to use the Interbank Marks or to engage in related charge card activities without the grant by Interbank to National Bank of a license to use the Marks, and the approval of Interbank of an application for membership of National Bank in Interbank; and

(iii) Inasmuch as National Bank is a "Canadian Person" within the meaning of Section 3(ii) of the License Agreement dated as of February 20, 1973, between Interbank and Bank of Montreal, Interbank is contractually prohibited from issuing a license to National Bank without the consent of Bank of Montreal, which consent has not heretofore been received by Interbank.

RESOLVED, that in the event that National Bank fails to apply for and obtain membership in Interbank, and to apply for and obtain (with the consent of Bank of Montreal) a license to use the Interbank Marks, no later than November 20, 1980, then in that event the proper officers and employees of Interbank are hereby authorized and directed to take such action as may be necessary to cause National Bank to cease and desist from using the Interbank Marks in any manner and to cease all charge card activities related thereto except those Liabilities of Terminated Members which are provided for in Article I, Section 13 of the Interbank By-laws and such provisions in the Rules of Interbank and in the Provincial Bank License Agreement as are applicable and which pertain to the orderly dissolution of a terminated member's Interbank-related charge card business.

RESOLVED, that to the extent necessary to ensure effectiveness of the foregoing Resolutions, and without prejudice to the effectiveness of such Resolutions in the absence of this Resolution:

(i) the Board of Directors of Interbank, pursuant to Article I, Section 11 of the Interbank By-laws, and by a vote of two-thirds of the entire Board, hereby terminates the membership formerly held by National Bank effective November 21, 1980, for the reasons (1) that Provincial Bank and National Bank have attempted to transfer and assign such membership and the license granted by Interbank to Provincial Bank to National Bank contrary to the provision of the Interbank By-laws and of the Provincial Bank License Agreement, and (2) that National Bank has attempted to use the Interbank Marks without legal authority to do so, and

(ii) the License Agreement between Interbank and Provincial Bank dated February 20, 1973, is hereby terminated pursuant to Section 14 thereof as of the effectiveness of termination of membership of Provincial Bank on the basis that Provincial Bank shall have ceased to be a member of Interbank; *provided, however,* that this Resolution shall be of no form or effect in the event that National Bank shall have applied for and obtained membership in Interbank, and shall have applied for and obtained (with the consent of Bank of Montreal) a license to use the Interbank Marks, no later than November 20, 1980.

RESOLVED, that the proper officers and employees of Interbank are hereby authorized and directed to communicate to Provincial Bank and National Bank expeditious and prompt written notice of the foregoing actions.