**TRUGMAN–NASH, INC. and Trio Cheese Imports, Inc., Plaintiffs,**

v.

**NEW ZEALAND DAIRY BOARD, MILK PRODUCTS HOLDINGS (NORTH AMERICA) INC. and Western Dairy Products, Inc., Defendants.**

**WESTERN DAIRY PRODUCTS, INC., Plaintiff,**

v.

**TRUGMAN–NASH, INC. and Trio Cheese, Inc., Defendants.**

Nos. 93 Civ. 831 (CSH),
93 Civ. 8329 (CSH).

United States District Court,
S.D. New York.

Feb. 24, 1997.

---

sis of the reasoning by which the court arrived at the challenged conclusion. A claim of Rule 3(j) "overlooking" may not be negated by simply demonstrating that counsel's prior arguments, or even the text of the challenged opinion, indicate some degree of judicial awareness of the matter or caselaw in question. A judge may be aware of something and still overlook it in the reasoning that leads to his conclusion.

After careful consideration of the briefs of counsel, I now conclude that defendants' motion for reargument in respect of the jurisdictional aspect of the case is well founded.

On their original motion, defendants contended that this Court's subject matter jurisdiction over plaintiffs' antitrust claims was precluded by the doctrines of act of state, foreign sovereign compulsion, and international comity. I said that these arguments required consideration of "the manner in which the New Zealand Dairy Board Act of 1961, as amended, created and governs the conduct of the NZDB." October Opinion at 909. In respect of the applicability of those doctrines, I identified as the controlling question "whether New Zealand law compels defendants to conduct their affairs in the manner described in the amended complaint, which plaintiffs say violate American antitrust law." *Id.* at 909 (footnote omitted). I based that perception upon *Hartford Fire Insurance Co. v. California,* 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993).

I remain of the view that *Hartford* articulates an important consideration in determining the extraterritorial effect of an American statute, although for the reasons stated *supra* I am no longer satisfied that, as the October Opinion implies, it is the only consideration. But the first issue that arises on this motion for reargument is whether I gave proper consideration to all the provisions of the Act, or, to state the matter more precisely, whether I overlooked an important provision.

The October Opinion at 911 sets forth the provisions of Part II, § 17 of the Act. Part II deals with "Marketing of Export Produce." § 17 sets forth the powers of the Board "as to acquisition and marketing of

Zuckerman, Spaeder, Golstein, Taylor & Kolker, New York City (Edward Little, Howard Adler, of counsel), for Trugman–Nash, Inc. and Trio Cheese Imports, Inc.

Baker & McKenzie, New York City (Lawrence W. Newman, Craig Celniker, Lalit Loomb, of counsel), for New Zealand Dairy Board, Milk Products Holdings (North America), Inc. and Western Dairy Products, Inc.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

In a Memorandum Opinion dated October 8, 1996, 942 F.Supp 905, ("the October Opinion"), familiarity with which is presumed, the Court *inter alia* denied defendants' motion to dismiss the antitrust claims plaintiffs plead in an amended complaint.

Defendants asserted two grounds for dismissal. First, they contended that the Court either lacked or should not exercise subject matter jurisdiction over plaintiffs' antitrust claims. Second, they contended that the claims failed to state a cause of action. The Court rejected these contentions.

Defendants have filed a timely motion for reargument pursuant to Civil Rule 3(j) of this Court, addressed to all holdings in the October opinion adverse to them.

Rule 3(j) requires a party moving for reargument to set forth "the matters or controlling decisions which counsel believes the court has overlooked."

■ I construe "overlooked" to mean, in this context, disregarded or not given sufficient consideration by a court in its *ratio decidendi.* Thus construed, evaluation of whether an opinion overlooked factual matters or "controlling decisions" requires analy-

export produce." § 17(1A) provides that any person wishing to export dairy produce from New Zealand "may apply to the Board for permission to do so . . ." While this provision is politely cast in permissive terms, I understand the statutory scheme to require that exporters apply to the Board for permission to export.

§ 17(1A) goes on to provide that the Board, "having had regard" to certain considerations, may grant or refuse a particular export application. Those considerations, set forth in § 17(1A)(a)–(c), are as follows:

  (a) The extent to which the markets are in states that do not impose quantitative restrictions on the importation of dairy produce; and

  (b) The extent to which the export of the produce to the markets might result in a direct or indirect reduction of the overall returns to the New Zealand dairy industry; and

  (c) Any other relevant guidelines for the time being established by the Board for the purposes of this section and published by the Board, . . .

While the statute is perhaps not a model of clarity, I interpret it as a mandate to the Board to take the specified considerations into account in deciding whether to approve an export application. I do not understand plaintiffs to question that proposition. Defendants' particular contention on the instant motion is that I overlooked the statutory command in § 17(1A)(a), namely, that the Board in deciding whether to grant or refuse an export application give "regard to . . . [t]he extent to which the markets are in states that do not impose quantitative restrictions on the importation of dairy produce." That mandate is pertinent to the case at bar because the United States, through its own statutory import quota system, imposes "quantitative restrictions on the importation of dairy produce."

Defendants are correct in saying that the October Opinion overlooked § 17(1A)(a). I did not physically overlook that subsection; its text is reproduced on page 8 of the Opinion, along with the rest of § 17. But § 17(1A)(a) played no part in that Opinion's *ratio decidendi.* I said nothing about wheth-

er or not the subsection made a difference to the conclusion reached, and why. The subsection was overlooked, as that term is used in Rule 3(j) analysis.

Moreover, I am now persuaded that § 17(1A)(a) makes a difference to the proper resolution of the case, particularly when it is read in conjunction with § 17(1A)(b).

■ Defendants argue plausibly that if individual New Zealand dairy producers were granted export licenses to sell cheese at greater discounts from the Green Bay Cheese Exchange price than the price imposed by the New Zealand Dairy Board, the consequence would be to "introduc[e] price competition into an undifferentiated market where only a fixed quantity can be sold." Defendants' Reply Brief on Reargument at 4. That would inevitably lead to a decrease in overall returns to the New Zealand dairy industry, a consequence which the Act mandates the Board to avoid under a fair reading of § 17(1A)(b).

In short, I am now persuaded that the Act mandates Board disapproval of sales price competition among New Zealand dairy producers in respect of exports to nations like the United States that restrict import quantities. That mandate is not cast in the terms of a Biblical commandment, "Thou shalt not," but I think that the statute's practical effect is the same. The granting to individual New Zealand producers of the sort of export licenses envisioned by plaintiffs would violate that mandate. It is difficult to imagine the Board concluding that it would conform to the requirements of the Act giving it life by disregarding the only two specific considerations in the statutory scheme, both of which militate against the approval of such applications.

So I think that, contrary to my prior conclusion, there is an actual and material conflict between American antitrust law and New Zealand law in respect of the marketing of dairy export produce. That conflict is sufficient to entitle defendants to invoke the doctrines of act of state, foreign sovereign compulsion, and international comity.

As a second ground· for granting defendants' motion for reargument, I am now persuaded that I overlooked controlling Second Circuit law with respect to the factors to be considered in an international comity analysis. Those have come to be known as the *Timberlane* factors, reflecting their genesis in Ninth Circuit cases. *See* October Opinion at 909.

■ In *Hartford,* the Supreme Court granted certiorari to consider the Ninth Circuit's decision in *In re Insurance Antitrust Litigation,* 938 F.2d 919 (9th Cir.1991). The Ninth Circuit referred to the seven factors articulated in its prior *Timberlane* decisions, concluded six of them militated in favor of American jurisdiction, but as to the seventh factor, construed United Kingdom regulatory law to conflict with United States antitrust law, thus requiring abstention by the district court.[1] The Supreme Court reversed, finding no conflict. In doing so, the Court did not have before it, and accordingly expressed no view upon, the validity of the other *Timberlane* factors. That is made explicit by the Court's observation that "[w]e have no need in this case to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on the grounds of international comity." ·509 U.S. at 799, 113 S.Ct. at 2911.

Defendants correctly observe that the October Opinion did not discuss the *Timberlane* factors, instead focusing exclusively upon the existence *vel non* of a conflict between United States and New Zealand law. Thus, for Rule 3(j) purposes, the October Opinion overlooked the *Timberlane* factors. And I agree with defendants that, for the reasons they state in their main brief at 8–9, those factors point in the direction of declining jurisdiction.

That is not the end of the analysis, since Rule 3(j) requires defendants to demonstrate that the Court overlooked "*controlling* decisions." In this District Court, only decisions of the Supreme Court and the Second Circuit are controlling; however distinguished judges in other circuits may. be, if I do not find their opinions persuasive, I may disregard them with impunity. The question therefore becomes whether the *Timberlane* factors constitute controlling. law in the Second Circuit.

I think that question must be answered in the affirmative. The issuance in ·1987 of the third text of the Restatement of the Foreign Relations Law of the United States adopted the .seven-factor analysis which the Ninth Circuit had reiterated in 1984 in *Timberlane II,* 749 F.2d 1378 (9th Cir.1984). Restatement (Third) § 403(2). The Second Circuit applied these factors, derived from the Restatement, in *United States v. ·Javino,* 960 F.2d 1137, 1142–43 (2d Cir.1992). ·The *Timberlane* factors were applied by name by the district court in *National Bank of Canada v.. Interbank ·Card ·Association,* 507 F.Supp. 1113, 1119–1121 (S.D.N.Y.1980), an opinion the Second Circuit affirmed at 666 F.2d 6 (2d Cir.1981).

Therefore I conclude that the October Opinion, in overlooking the *Timberlane* factors which militate against jurisdiction, also overlooked controlling Second Circuit law.

It follows that defendants' motion for reargument will be granted, and the plaintiffs' antitrust claims will be dismissed.

■ I regard this case as appropriate for a direction under Rule 54(b), Fed.R.Civ.P., that judgment dismissing these claims be entered at this time.

Rule 54(b) provides in pertinent part that

[w]hen more than one claim for relief is · presented in an action . . . òr when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties . . . upon an express de-

---

1. The *Timberlane* factors are "the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business or corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or effect American commerce, the foreseeability of such effect,· and the relative importance to the violations charged of conduct within the United States.as compared with conduct abroad." *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597, 614 (9th Cir.1976) (*Timberlane I* ).

termination that there is no just reason for delay and upon an express direction for the entry of judgment.

In *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1091 (2d Cir.1992), the Second Circuit said that to permit entry of a final, immediately appealable Rule 54(b) judgment, there must be

(1) multiple *claims* or multiple *parties* ..., (2) at least one claim, or the rights and liabilities of at least one party, must be finally decided within the meaning of 28 U.S.C. § 1291, and (3) the district court must make "an express determination that there is no just reason for delay" and expressly direct the clerk to enter judgment. (emphasis in original)

The Second Circuit has recently considered the appropriateness of Rule 54(b) orders in *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11 (2d Cir. 1997). The district court must articulate the reason or reasons why a disposition should be appealable immediately. Its explanation is entitled to substantial deference by the court of appeals, which reviews the matter for abuse of discretion, but also with regard to the established federal policy against piecemeal appeals. *Id.* at 16 (citations omitted).

Factors militating in favor of a Rule 54(b) direction include the interests of judicial efficiency. That factor allows consideration of the relative efficiency of separate trials or a single trial, and whether the piecemeal appeals would present "overlapping issues to the reviewing panels." *Id.* at 17. Overlapping appellate issues would argue against separate appeals, but that concern does not arise if "[n]othing that will be aired at trial can be expected to shed light" on the issues to be presented on the first appeal. *Id.*

These considerations justify a Rule 54(b) direction in the case at bar. The viability of plaintiffs' antitrust claims present issues unrelated to the commercial claims of breach of contract, *quantum meruit* and common law fraud that precede them in the amended complaint. Resolution of the antitrust claims by the court of appeals at this time will also impact upon the proper scope of pretrial discovery, which will be considerably more extensive if the antitrust claims remain in the case. That consideration implicates the efficient expenditure of the resources of the parties as well those of the district court. And, if plaintiffs' antitrust claims form a proper part of this case, a single trial of all claims is preferable. Accordingly I will make a Rule 54(b) direction in this case.

As noted, defendants also move for reargument of the Court's denial of their Rule 12(b)(6) motion seeking dismissal of the antitrust claims on the merits. Because I have concluded that defendants' objections to this Court's subject matter jurisdiction are well founded, I do not think it is appropriate to say anything further on the merits, and accordingly do not reach that aspect of the present motion. Whether the court of appeals wishes to address those issues at this time is respectfully left for the consideration of that court.

Plaintiffs' fourth and fifth claims, as asserted in the amended complaint, are dismissed for lack of subject matter jurisdiction. There being no just reason for delay, the Clerk of the Court is directed to enter judgment dismissing those claims.

It is SO ORDERED.