EL CID, LTD., Plaintiff,

v.

The NEW JERSEY ZINC COMPANY, Gulf & Western Industries, Inc., Gulf & Western International Holding Company, Gulf & Western (Canada) Limited, Watts, Griffis & McQuat, Limited, Camino Gold Mines Limited, Confor Mining, Inc., Richard W. Hogeland and David M. Koogler, Defendants.

No. 76 Civ. 1388 (WK).

United States District Court,
S.D. New York.

Nov. 30, 1982.

Malcolm H. Bell, Norwalk, Conn., for plaintiff.

Joseph Einstein, Kassel, Hoffman, Neuwirth & Geiger, Arthur Sobel, Kimmelman, Sexter & Sobel, New York City, for defendants.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

After extensive discovery, the so-called Gulf & Western defendants[1] have brought a motion for summary judgment against the antitrust claim of the second amended complaint. For reasons set forth below, it is conditionally granted.[2]

## THE ANTITRUST CLAIM

This case involves eight gold mining concessions [the Bolgol Concessions] located in Bolivia's Tipuani Valley. These concessions are owned by defendant Camino Gold Mines Ltd. [Camino], which does not mine them for gold. It is plaintiff's contention that, had the defendants not prevented it by unfair means from obtaining the necessary funds from its American backers, it—and not Camino—would now be the owner of the Bolgol Concessions. Plaintiff, moreover, asserts that it—unlike Camino—would have mined the concessions for gold.

The antitrust claim at issue is based on section 1 of the Sherman Act, 15 U.S.C. § 1, and section 73 of the Wilson Tariff Act which extends the antitrust laws to the importation of goods. 15 U.S.C. § 8. It alleges that defendants conspired wrongfully to deprive plaintiff of the Bolgol Concessions. This conspiracy is claimed to have affected, among others, the security markets and commerce in mining equipment and machinery. Complaint ¶ 22. In this connection the complaint states at ¶ 25:

> The acts of the defendants have had and will have a substantial impact on trade and commerce among the several States and with foreign nations, *in particular* but without limitation, *trade and commerce in mining equipment and machinery, in gold, and in the securities of such defendants as are publicly held and traded.* The combination, conspiracy and concert of action alleged herein are between and among persons and corporations who, as agents or principals, are engaged or to become engaged in importing gold and other commodities into the United States; and such combination, conspiracy and concert of action are intended to operate in restraint of lawful trade and commerce. (Emphasis supplied.)

## THE INSTANT MOTION

It is axiomatic that a motion for summary judgment may not be granted unless, after resolving all ambiguities and drawing all reasonable inferences in favor of the party against whom summary judgment is sought, there remains no material fact genuinely in dispute. *FLLI Moretti Cereali v. Continental Grain Co.* (2d Cir. 1977) 563 F.2d 563, 565; 6 Moore's Federal

---

1. The New Jersey Zinc Company, Gulf & Western Industries, Inc., Gulf & Western International Holding Company, Gulf & Western (Canada) Limited, Richard W. Hogelan, and David Koogler.

2. Since early 1978 the parties have conducted extensive discovery under the supervision of a Magistrate. In September of 1981 the Magistrate recommended that the Gulf & Western defendants be allowed to make the present motion. The motion was briefed and oral argument was held. Before we could rule, however, this action was stayed pending the outcome of unrelated litigation in another court among the holders of plaintiff's outstanding shares concerning the ownership of the corporate plaintiff. That matter has been resolved and the stay in this case has, accordingly, been lifted. Thus, the motion is now ripe for decision.

Practice ¶ 56.23.[3] Accordingly, for the purposes of this motion, we will accept as established that defendants did indeed use unfair means to deprive plaintiff of the Bolgol Concessions and that the alleged conspiracy among defendants was planned and set in motion in the United States. We will focus at the outset on the pivotal question whether—on the assumption that unfair means were used—their "intended effects" had a sufficient impact upon United States commerce to warrant application of the antitrust laws to this extraterritorial dispute. We answer this first question in the negative. Furthermore, we then go on to observe that, after several years of discovery, plaintiff has failed to submit such evidence as would allow a reasonable jury to find defendants' conduct in depriving plaintiff of the Bolgol Concessions to have had an anticompetitive effect.

## THE UNITED STATES CONNECTION

### Facts

As noted above, the subject of this lawsuit is a gold mining concession located in Bolivia's Tipuani Valley and now owned by defendant Camino—a Canadian corporation.

Plaintiff is a corporation organized in the Cayman Islands, British West Indies, with offices in San Jose, Costa Rica. It is not authorized to do business in any jurisdiction within the United States, and has no office or place of business here. It has, however, provided investment advice to investors in this country, and has had American citizens as stockholders. Plaintiff's Rule 3(g) Statement ¶ 2.[4] Moreover, plaintiff, its predecessors, and stockholders have generally conducted business in U.S. dollars, plaintiff's only checking account (presumably with a foreign bank) is and always has been denominated in U.S. dollars, and plaintiff's two main backers on the Bolgol venture— S.J. Groves & Sons Co. and William J. Kilpatrick—are both American. Plaintiff's Rule 3(g) Statement ¶ 57.

The cast of defendants includes three that are Canadian: Camino (the vehicle for defendants' Bolivian mining ventures), Watts, Griffis & McQuat, Ltd., and Gulf & Western (Canada). The other defendants, however, are American. As stated above, for present purposes, it must be taken as established that the alleged conspiracy to deprive plaintiff of the Bolgol was planned and set in motion within the United States. Thus, plaintiff avers that defendant Gulf & Western expended some $2,275,000 in interstate and foreign commerce in this connection; that defendants sought financing of approximately $7,000,000 for the project from New York City banks and financiers, obtaining a conditional commitment in 1975; and that defendants purchased and prepared to ship from California to Bolivia a large walking dragline valued at several hundred thousand dollars. Plaintiff's Rule 3(g) Statement ¶¶ 45, 47, 48.

All parties, moreover, used airlines, telexes, telephones, and other instrumentalities of United States interstate and foreign commerce and communication in their respective efforts to secure the Bolgol. Plaintiff's Rule 3(g) Statement ¶ 51.

As to the effect on United States commerce, plaintiff avers that, had defendants not wrongfully deprived it of the Bolgol, it and its partners would have purchased the bulk of their mining equipment—some several million dollars worth—in the United States. Defendants having failed to go forward with the venture, these purchases

---

**3.** We are aware, of course, that "summary proceedings in antitrust litigation are disfavored", *Poller v. Columbia Broadcasting System, Inc.* (1962) 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458, but "they are not to be read out of the antitrust laws." *Reading Ind. v. Kennecott Copper Corp.* (2d Cir.1980) 631 F.2d 10, 13, n. 6.

**4.** A Rule 3(g) Statement is a "short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried", or as to which the party in opposition contends there are indeed triable issues. *See* Local Civil Rule 3(g) (formerly 9(g)). Plaintiff's Rule 3(g) Statement refers to certain of its "principals" as being United States citizens. We interpret the term "principals" to mean holders of the outstanding shares of plaintiff's stock.

were wholly lost to domestic commerce. Moreover, plaintiff offers documents which suggest that even if defendants had gone forward with the project, they would have purchased most of the necessary mining equipment in Canada, not in the United States. Plaintiff's Rule 3(g) Statement ¶¶ 49–50.

Plaintiff further avers that it would have brought into the United States a large portion either of the gold mined from the Bolgol or of the money received for it. Plaintiff's Rule 3(g) Statement ¶ 57. It concedes, however, that defendants would have, likewise, brought into the United States the fruits of the Bolgol had they not "failed to go forward with the project through their own missteps and fallings-out..." Plaintiff's Rule 3(g) Statement ¶ 56.

Finally, plaintiff states that its ability to conduct business in the United States and elsewhere has been hindered by defendants' actions, which wrongfully deprived it of "cash flow for implementing such operations." Plaintiff's Answer to Interrogatories, No. 15(c).

*Discussion*

Plaintiff's claim must fail because its impact on United States commerce is insufficient to warrant the application of the antitrust laws. As to this phase of the defendants' motion, Judge Learned Hand established the focus of inquiry with the oft-quoted statement that:

We should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States. *United States v. Aluminum Co. of America* (2d Cir.1945) 148 F.2d 416, 443.

There has been no want of litigation over the question of what must be shown to establish at least *some* "consequences" within the United States. *Timberlane Lumber Co. v. Bank of America* (9th Cir. 1976) 549 F.2d 597, 608 n. 12. *See, generally,* 6 Toulmin's Antitrust Laws § 31.7. A recent review of the law led Judge Carter to rule that any demonstrable effect would suffice, so long as it was not *de minimus.* Thus, in *Dominicus Americana Bohio v. Gulf & Western Industries* (S.D.N.Y.1979) 473 F.Supp. 680 he observed at 687:

> According to the *Alcoa* rule, even wholly foreign conduct may come within the sweep of the antitrust laws if it has a sufficient effect on the interstate or foreign commerce of the United States. Indeed, it is probably not necessary for the effect on foreign commerce to be both substantial and direct as long as it is not *de minimis.* (Citations omitted.)

Accepting Judge Carter's formulation of the doctrine, we conclude that any effect in the United States of the alleged conspiracy would be, at most, *de minimis.*[5] (Footnote omitted.)

Examination of the cases cited by plaintiff on this issue shows that in each of them the defendants were claimed to have

---

**5.** The *Alcoa* rule—also known as the "intended effects" test, *see Conservation Council of Western Australia v. Alcoa* (W.D.Pa.1981) 518 F.Supp. 270, 275; *Dominicus Americana Bohio v. Gulf & Western, supra,* 473 F.Supp. at 687—is the law in this Circuit. However, the rule has not remained unchanged since the mid 1940s when Judge Hand penned that well-known passage. As Judge Carter himself stated in *Dominicus,* "the effects test alone is inadequate, because it fails to take into account potential problems of international comity." *Id.* A commentator recently thus summarized the legal trend:

> ... American courts ... based their decisions to apply American antitrust law to foreign restraints exclusively on the effect of such restraints on United States foreign commerce. Their central concern was to draw the line between restraints that Congress in-

tended to reach and restraints it did not intend to reach....

> This attitude has recently given way to an awareness ... that courts should weigh foreign regulatory interests ... when deciding whether to give extraterritorial effect to American antitrust law. Note, *Foreign Sovereign Compulsion in American Antitrust Law.* 33 Stanford L.Rev. 131, 132–33 (1980) (footnotes omitted).

Accordingly, at least two Circuits—the Third in *Mannington Mills v. Congoleum Corp.* (3d Cir. 1979) 595 F.2d 1287, and the Ninth in *Timberlane Lumber Co. v. Bank of America, supra,* 549 F.2d 597—have applied the "intended effects" test only "as the first step in a two-step process ... in determining whether to assert extraterritorial jurisdiction pursuant to the Sherman Act. * * * If such jurisdiction is proper [under the *Alcoa* rule] the court should then use a balancing test that takes into

conspired to control or to destroy some specific business activity—either in existence or realistically planned—within the United

account various foreign relations impact factors in order to determine whether the exercise of that jurisdiction is appropriate." *Conservation Council of Western Australia v. Alcoa, supra,* 518 F.Supp. at 275. *See also Industrial Inv. Development Corp. v. Mitsui & Co.* (5th Cir.1982) 671 F.2d 876, 884 n. 7. In light of our ruling that plaintiff has failed under the "old" *Alcoa* test, we have no occasion to speculate whether our Circuit would follow the trend and thus modify the *Alcoa* rule in accordance with the teachings of *Timberlane* or *Mannington Mills.* Cf. *Dominicus Americana, supra,* 473 F.Supp. at 687–88.

**6.** So far as we are aware, the collection of cases cited by plaintiff includes practically all regularly cited decisions on the extraterritorial application of antitrust legislation. We here briefly refer to each of the cases plaintiff has cited. In *United States v. Sisal Sales Corp.* (1927) 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042, among the allegations of the government's complaint were that the domestic commerce of the United States had an annual requirement of two hundred fifty to three hundred million pounds of sisal, all of which the defendants conspired to control; and that in the course of the conspiracy the defendants foreclosed mortgages on, and took title to, four hundred thousand bales of fiber actually stored within the United States. *Id.* at 272, 47 S.Ct. at 592. In *United States v. National Lead Co.* (1947) 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077, *affirming, United States v. National Lead Co.* (S.D.N.Y.1945) 63 F.Supp. 513, the government's complaint alleged, among other things, that the importation of titanium pigments was essential to a forty-million dollar domestic manufacturing industry, *Id.* at 517, and that no "titanium pigments entered the United States except with the consent of" one of the conspirators. *Id.* at 522. In *Continental Ore Co. v. Union Carbide* (1962) 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777, the Supreme Court remanded for a new trial, overturning the Ninth Circuit's decision to grant a directed verdict for defendants who had been charged with violating Sections 1 and 2 of the Sherman Act. "The complaint stated that [in the relevant period] the defendants produced over 99% of all ferrovanadium and over 90% of all vanadium oxide [the relevant markets] produced in the United States and that during the same period the defendants sold over 99% of the ferrovanadium and vanadium oxide sold in this country." *Id.* at 693–94, 82 S.Ct. at 1408 (footnote omitted). It was held that the trial court had erred in rejecting plaintiffs' offer to prove that they had been excluded from the Canadian market by a wholly owned

States, or had cut off the importation into the United States of specifically designated goods.[6] It can readily be seen that these

subsidiary of one of the defendants "allegedly operating . . . for the purpose of carrying out the overall conspiracy to restrain and monopolize the vanadium industry." *Id.* at 703, 82 S.Ct. at 1413. Such offer of proof was ruled relevant evidence as to the allegations of domestic misconduct, but there is no suggestion that the Canadian events—standing alone— would be cognizable under the antitrust laws. *Pfizer, Inc. v. India* (1978) 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563, merely established that a foreign government is a "person" within the meaning of § 4 of the Clayton Act, and has no bearing on the question before us. In *Timberlane Lumber Co. v. Bank of America, supra,* 549 F.2d 597, it was alleged that plaintiff was an Oregon partnership principally involved in the purchase and distribution of lumber at wholesale within the United States and in its importation into the United States for sale and use. *Id.* at 603. *Yentsch v. Texaco, Inc.* (2d Cir.1980) 630 F.2d 46, dealt with an alleged conspiracy in violation of § 1 of the Sherman Act whereby a domestic oil company sought to control the prices changed by its American retailers. In *Industrial Investment Development Corp. v. Mitsui & Co.* (5th Cir.1982) 671 F.2d 876, the Court of Appeals reversed an order granting summary judgment prior to discovery where it had been alleged that an American company engaged in importing lumber into the United States had conspired to prevent another American company from competing with it. In *Joseph Muller Corp. v. Societe Anonyme de Gerance* (2d Cir.1971) 451 F.2d 727, "the trade and commerce in the commodity involved originated in the United States and was to be shipped from it to other countries." *Id.* at 729. In *Sanib Corp. v. United Fruit Co.* (S.D.N.Y.1955) 135 F.Supp. 764, the District Court declined to dismiss as insufficient on its face a complaint by a United States citizen who alleged that a business he had been conducting in New York City had been destroyed by the alleged conspiracy. *Todhunter-Mitchell & Co. v. Anheuser-Busch Inc.* (E.D.Pa.1974) 383 F.Supp. 586, involved imposition of territorial restraint on distributors of beer in, among other places, Miami and New Orleans. In *Dominicus Americana Bohio v. Gulf & Western, supra,* 473 F.Supp. 680, Judge Carter denied summary judgment prior to discovery where plaintiffs, some of whom were American corporations, claimed to have been prevented from soliciting American citizens to travel from the United States to the Dominican Republic. *Id.* at 688, and further claimed that the use of American transportation facilities had been restricted by the conspiracy. *Id.* at 685. *National Bank of*

cases lend no support to a claim by a foreign plaintiff who has never imported anything into the United States and only alleges the vaguest and undocumented hope of ever doing so.

The startling thing about the facts and arguments submitted by plaintiff is that, despite the assertion that plaintiff and its predecessors had previously conducted "mining operations in Latin America" and that its president had "engaged in mining for many years", *see* Memorandum in Opposition at 10, 16, there is no suggestion that plaintiff, its president, or its predecessors had ever sold an ounce of gold or any other metal in the United States, or had made any specific plans to do so. All that we are given on this score is the vague and undocumented hope that, but for the conspiracy, many "millions of dollars and perhaps billions in gold and/or the proceeds of gold would have flowed from Bolivia" to the United States. No case cited by the plaintiff—nor the totality of all of them—suggests that the alleged frustration of such a vague hope can be deemed to constitute a recognizable consequence within the United States.

## ANTI–COMPETITIVE EFFECT

*Facts*

Despite the completion of discovery [7], there is not enough here to support a reasonable finding that an antitrust violation has indeed occurred. Very little of substance can be gleaned from the papers submitted in connection with the instant motion as to the anti-competitive effect of defendants' conspiracy.

Defendants state flatly that there is no evidence that their actions did in fact restrain either gold mining or gold production. They further observe that plaintiff is not, and never has been, in either the mining equipment or the securities industries. Memorandum in Support of the Motion for Summary Judgment or Dismissal (hereinafter "Defendant's Memorandum") at 15, 17.

In response plaintiff contends that the relevant product markets include both the gold mining and mining equipment industries and that defendants have failed to focus on the commercial realities of the relevant geographic market—the Tipuani Valley in Bolivia. Plaintiff's Memorandum of Law in Opposition to G & W Defendants' Motion (hereinafter "Plaintiff's Memorandum") at 13. As to the gold mining industry, plaintiff claims that defendants' predatory conduct has barred all in that industry from a competitive chance at the Bolgol—the key concession in the gold-rich Tipuani Valley. *Id.* at 21. Plaintiff further observes that defendants are owners of other concessions in the Tipuani Valley—*e.g.,* the Rosario Concessions. These are currently out of production for all practical purposes, but were exploited by defendant Condor from 1966 to 1971. As set forth by the affidavit of James Bates submitted in support of the instant motion, defendants initially contemplated mining the Bolgol in conjunction with three other groups of concessions in the Tipuani Valley. Plaintiff's Supplemental Memorandum in Opposition at 1–2.

As to the mining equipment industry, plaintiff merely states:

> The conspiracy also turned out to have an adverse effect on the mining equipment industry in that El Cid and its partner would have bought several million dollars worth of equipment, and defendants in fact did not. It should also be noted that the plainly predatory intent of defend-

*Canada v. Interbank Card Ass'n* (S.D.N.Y.1980) 507 F.Supp. 1113, had to do with a conspiracy to control the use of credit cards which had effects on, among other things, "the continuous use of Master Charge cards in the United States and Canada by cardholders who cross the border, [and] on the clearing activities of the various United States banks in the Interbank system..." *Id.* at 1120–21.

7. Plaintiff asserts that certain interrogatories are still outstanding, but specifically disclaims any contention that discovery should not be deemed complete for purposes of this motion. Plaintiff's Memorandum of Law in Opposition to G & W Defendants' Motion at 8.

ants' conduct in this case bolsters the conclusion that their conduct had an anti-competitive effect. Plaintiff's Memorandum at 22 (citations omitted).

Neither side, however, has provided us with any information about the gold market, the gold mining industry, or the mining equipment industry. In particular, we have no information on how or where gold is sold in Bolivia or world-wide; how far afield mining operators generally look for mining equipment, and what governs its selection; what percentage of world-wide or even national production of gold the Bolgol is capable of supplying; and what percentage of world-wide or other sales of mining equipment an operation of the Bolgol's projected size might reasonably be expected to require.

### Discussion

 Plaintiff has failed to make out a *prima facie* case of antitrust violation. We discard at the outset the line of cases, based on the First Circuit's opinion in *Albert Pick-Barth Co. v. Mitchell Woodbury Corp.* (1st Cir.1932) 57 F.2d 96, *cert. denied,* 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288, *later limited by George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.* (1st Cir.1974) 508 F.2d 547, which hold that a conspiracy to eliminate a competitor by unfair means is *per se* a violation of the Sherman Act. It seems to us the better rule is the one enunciated by the Court in *Northwest Power Products, Inc. v. Omark Industries, Inc.* (5th Cir.1978) 576 F.2d 83, that such conduct rises to the level of a Sherman Act violation only when it has an anticompetitive effect. *Id.* at 90. *See also Eye Encounter, Ind. v. Contour Art, Ltd.* (E.D.N.Y.1979) 81 F.R.D. 683, 690; *Mr. Hanger, Inc. v. Rizzuto* (S.D. N.Y.1975) 410 F.Supp. 1158 (dismissed for lack of jurisdiction); *Vogue Instrument*

*Corp. v. Lem Instruments Corp.* (S.D.N.Y. 1966) 40 F.R.D. 497 (summary judgment denied). Thus, in sustaining a grant of summary judgment for a defendant who had concededly conspired to eliminate a competitor by unfair means, the *Northwest Power* Court observed:

> [A]bsent some market impact comparable to that which would be forbidden by the law of mergers, the interests protected by the antitrust laws never arise. 576 F.2d at 89.

*Compare Whitten, supra,* 508 F.2d 547, 567, n. 31 (where there is no potential for an actual market effect there can be no liability even for conduct that would otherwise be a *per se* violation of the Sherman Act Section 1).

The difficulty with plaintiff's position in this regard is its failure to define the relevant geographic market. *See Coniglio v. Highwood Services, Inc.* (2d Cir.1974) 495 F.2d 1286, 1292 ("before there can be a conclusion as to whether there has been ... a contract in restraint of trade, a determination must be made as to what [is] the relevant ... market") (citing cases). Clearly the relevant product is gold. The plaintiff has suggested nothing to overcome what we believe to be the universally recognized fact that the market for gold is world-wide.[8] Although, as noted, neither party has furnished us with any information about the size of the international gold market, defendants' potential market share is obviously minimal. Therefore, it is difficult to conceive how anything defendants may have done or may plan to do with the Bolgol Concessions—from shutting them down entirely to combining their operation with that of other mines in the Tipuani Valley—could have any noticeable effect on the world-wide market for gold.[9]

---

**8.** For these purposes, we join plaintiff in rejecting defendants' contention that Bolivian gold can be sold only to the Bolivian government.

**9.** In a different context the Supreme Court observed, "in general restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price." *Apex Hosiery Co. v. Leader* (1940) 310 U.S. 469, 500, 60 S.Ct. 982, 996, 84 L.Ed. 1311.

Certainly, we have been given no information which would suggest that control over the Bolgol Concessions by defendants rather than by plaintiff would have any effect on the world-wide price of gold, nor how such control would "suppress or even destroy competition." *Chi-*

Plaintiff seeks to circumvent this difficulty by focussing on the resources of the Tipuani Valley as viewed from the perspective of a gold mining concern. The gold miner, however, is nothing more nor less than a seller of gold on the world market. As Judge Weinfeld aptly observed in *United States v. Bethlehem Steel Corp.* (S.D.N.Y.1958) 168 F.Supp. 576, 592:

> Any definition of line of commerce which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful.

Put another way, plaintiff—in urging us to consider the effect of the alleged conspiracy on the gold mining industry in the Tipuani Valley—would have us focus on the effect on *competitors* rather than on competition. It is abundantly clear, however, that the Sherman Act protects competition not competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* (1977) 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701; *Jarmatt Truck Leasing Corp. v. Brooklyn Pie Co.* (S.D.N.Y. 1981) 525 F.Supp. 749, 750; *Bustop Shelters, Inc. v. Convenience & Safety Corp.* (S.D.N.Y.1981) 521 F.Supp. 989, 997; *Clarke v. Amerada Hess Corp.* (S.D.N.Y.1980) 500 F.Supp. 1067, 1074.

We regard as frivolous plaintiff's suggestion that we should consider the effect on the mining equipment industry. The avowed object of defendants' conspiracy was to secure ownership of the Bolgol; any effect it may have had on the mining equipment industry was accordingly fortuitous.[10] Furthermore, it is sheer speculation wheth-er the shift in ownership of the Bolgol from plaintiff to defendants had any effect on the amount of mining equipment purchased, on the source thereof, or generally on competitive conditions in the market for mining equipment.[11]

## CONDITIONS FOR GRANTING SUMMARY JUDGMENT

On the facts before us it seems that defendants' motion for summary judgment as to the antitrust claim should be granted. However, plaintiff strongly argues that it might ill serve judicial economy to grant the instant motion and then be faced with a trial of plaintiff's remaining claims—which would require proof of many of the same facts involved in the antitrust claim. In this connection it will be recalled that defendants have already indicated an intent to move for summary judgment on plaintiff's other claims, but that we had ruled that permission for such further motion would be withheld until we should determine whether the instant motion was viable. Accordingly, we shall hold in abeyance entry of judgment dismissing the antitrust claim and direct that defendant serve any further motions for summary judgment on or before the 12th day of January, 1983. In the event no further motion is made, or having been made is denied, we shall hear argument addressed to the specific question of whether partial summary judgment dismissal of the antitrust claim would enhance or impair judicial economy.

SO ORDERED.

cago Board of Trade v. United States (1918) 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683; *Apex Hosiery, supra,* 310 U.S. at 501, 60 S.Ct. at 996; *E.J. Delaney Corp. v. Bonne Bell, Inc.* (10th Cir.1975) 525 F.2d 296, 302, *cert. denied* (1976) 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758.

10. Plaintiff points out that, as things turned out, disputes among the defendants prevented them from exploiting the Bolgol once they had acquired it. Defendants' failure in this regard, however, is clearly independent of the claimed anti-competitive thrust of the conspiracy alleged. *Cf. Schwimmer v. Sony Corp. of America* (2d Cir.1980) 637 F.2d 41, 48 (*quoting Contreras v. Grower Shipper Ass'n* (N.D.Cal.1971) [1971] Trade Cas. ¶ 73,592, *aff'd per curiam,*

(9th Cir.1973) 484 F.2d 1346, *cert. denied,* (1974) 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490).

11. Plaintiff's standing to sue on such an injury is altogether questionable. *See Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.* (2d Cir.1971) 454 F.2d 1292, 1295; *Reading Ind. v. Kennecott Copper Corp.* (2d Cir.1980) 631 F.2d 10, 12–13; *Schwimmer v. Sony Corp. of America* (2d Cir.1980) 637 F.2d 41, 46–47. *But cf. Reiter v. Sonotone Corp.* (1979) 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931; *Blue Shield of Virginia v. McCready* (1982) —— U.S. ——, 102 S.Ct. 2540, 73 L.Ed.2d 149.