### PAPST MOTOREN GMbH & CO. KG, Plaintiff,

v.

### KANEMATSU–GOSHU (U.S.A.) INC., a, New York Corporation, Kanematsu-Goshu Ltd., a Japanese Corporation and Shinano Tokki Corporation, a Japanese Corporation, Defendants.

No. 84 Civ. 7194.

United States District Court, S.D. New York.

Jan. 9, 1986.

Leonard J. Santisi, Theodore F. Shiells, Curtis, Morris & Safford, New York City, John F. Flannery, Philip H. Watt, Fitch, Even, Tabin & Flannery, Chicago, Ill., for plaintiff.

Richard K. Jeydel, Kanematsu-Gosho (U.S.A.) Inc., New York City, David Goldberg, Cowan, Liebowitz & Latman, P.C., New York City, A. Sidney Katz, Roger D. Greer, Welsh & Katz, Ltd., Chicago, Ill., for defendants.

ROBERT L. CARTER, District Judge.

Plaintiff, Papst Motoren GMbH & Co. KG ("Papst"), a West German limited liability company which manufactures various types of computer motors, charges that defendants have been and are infringing three of its patents: U.S. Letters Patent No. 3,873,897, ("897") covering an invention entitled "Collector-Less-DC Motor"; U.S. Letters Patent No. 4,429,263, ("263") covering an invention called "Low Magnetic Leakage Flux Brushless Pulse Control D–C Motor"; and U.S. Letters Patent No. 4,438,542 ("542") covering an invention entitled, "Disk Storage Drive".[1]

Plaintiff charges that defendant Kanetmatsu-Gosho Ltd. ("K–G Japan"), a Japanese corporation with its principal place of business in Japan, has actively induced infringement of each of the above-named patents by "selling to Kanematsu USA [K–G USA] for resale in the U.S.A. the subject matter of each of the Letters Patent," (*Amended Complaint* at ¶¶ 11, 12), and will continue to induce infringement of plaintiff's named patents unless enjoined by this court.

Defendant Kanematsu-Gosho U.S.A., Inc., ("K–G USA"), a wholly-owned United States subsidiary of K–G Japan, is charged with infringing the above named patents by "using and selling the subject matter of each of the Letters Patents," (*Amended Complaint* at ¶ 10). Plaintiff avers that such alleged infringement activity will continue unless K–G USA is enjoined.

Defendant Shinano Tokki Corporation ("STC"), a Japanese corporation with its principal place of business in Japan, is also charged with infringing plaintiff's three

named patents by "selling to [defendant K–G Japan] for resale to [defendant K–G USA], which in turn, resells in the United States the subject matter of each of [plaintiff's patents]." (*Amended Complaint* at ¶ 12).

Plaintiff's patent infringement claim has triggered a cross-fire of motions and counterclaims.[2] Defendants STC and K–G USA filed counterclaims against plaintiff for violations of the antitrust laws of the United States, particularly Section 2 of the Sherman Act, 15 U.S.C. § 2, alleging that this litigation was initiated and conducted in bad faith and constitutes an attempt to monopolize. Plaintiff moves, pursuant to Rule 12(b)(6) and Rule 12(b)(1), F.R.Civ.P., to dismiss defendants' counterclaims on the grounds that they do not state claims upon which relief can be granted, and that the court lacks subject matter jurisdiction with respect to STC's antitrust counterclaim. Plaintiff also moves to disqualify the law firm that represents STC alleging that STC's attorneys were formerly counsel for plaintiff and have now "switched sides." In response to the motion to disqualify, STC moves to compel the attendance of Hans Dieter Papst, Patent Department Manager of Papst, at a deposition, or alternatively to strike his declaration on matters pertaining to the disqualification motion. Plaintiff, in turn, moves to strike STC's supplemental memorandum in opposition to plaintiff's motion to disqualify, and in the alternative to permit the filing of a surreply memorandum.

A. *Plaintiff's Rule 12(b) Motions To Dismiss*

For purposes of plaintiff's motions to dismiss, the allegations of the antitrust

---

1. According to the amended complaint, Patent No. 3,873,897 and No. 4,429,263 were "duly and legally issued to Papst Motoren's predecessor company, Papst Motoren KG." Papst, as successor to all personal property of its predecessor company, claims to be the exclusive licensee of these two patents. (*Amended Complaint for Patent Infringement* at 2, 3).

2. On April 4, 1985, this court denied by endorsement K–G Japan's and K–G USA's motion to transfer this action to the United States District Court for the District of New Jersey, pursuant to

28 U.S.C. § 1404(a). Defendant K–G Japan had also moved to dismiss the complaint with respect to itself under Rule 12(b), F.R.Civ.P. for lack of personal jurisdiction. However, the parties have since stipulated that K–G Japan withdraw this motion. Therefore, the parties may now, in accord with their December 27, 1985 stipulation, resume discovery on the merits, which had been stayed pending disposition of K–G Japan's motion to dismiss for lack of personal jurisdiction.

counterclaims must be taken as true, *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corporation,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Kugler v. Helfant,* 421 U.S. 117, 125 n. 5, 95 S.Ct. 1524, 1531 n. 5, 44 L.Ed.2d 15 (1975); *Fine v. City of New York,* 529 F.2d 70, 75 (2d Cir.1975), and the motions may be granted only if it appears beyond doubt that K–G USA and STC can prove no set of facts in support of their claims which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Dahlberg v. Becker,* 581 F.Supp. 855, 859 (N.D.N.Y.) *aff'd* 748 F.2d 85 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1984).

### 1. *Subject Matter Jurisdiction*

■ The enforcement of a patent procured by fraud on the Patent Office may violate Section 2 of the Sherman Act provided that the other elements necessary to a Section 2 case are established; in such event, the treble damages provision of Section 4 of the Clayton Act, 15 U.S.C. § 15, would be available to the injured party. *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corporation, supra,* 382 U.S. at 174, 86 S.Ct. at 349.

Section 7 of the Sherman Act provides that the Act:

shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States;

15 U.S.C. § 6a.

Plaintiff contends that STC, a Japanese corporation which does not sell the motors in dispute in the United States, "has failed to allege a 'direct, substantial, and reasonably foreseeable effect' on import trade, as required by 15 U.S.C. § 6a," since any lost sales of STC caused by alleged Papst antitrust violations did not occur in the United States; hence, Papst argues, STC's antitrust counterclaim should be dismissed for lack of subject matter jurisdiction. *(Memorandum in Support of Plaintiff's Motion under F.R.Civ.P. 12(b) To Dismiss STC's Antitrust Counterclaim ).*

The extraterritorial reach of the Sherman Act depends on whether the challenged restraint has, or is intended to have, any anticompetitive effect upon United States commerce, either foreign or interstate. *National Bank of Canada v. Interbank Card Association,* 666 F.2d 6, 8 (2d Cir.1981). This court has held that any demonstrable effect on United States commerce will suffice, so long as it is not de minimus, *see Dominicus Americana Bohio v. Gulf & Western Industries,* 473 F.Supp. 680, 687 (S.D.N.Y.1979) (Carter, J.) ("even wholly foreign conduct may come within the sweep of the antitrust laws if it has a sufficient effect on the interstate or foreign commerce of the United States. Indeed, it is probably not necessary for the effect on foreign commerce to be both substantial and direct as long as it is not de minimus"). Hence, Section 7 does not preclude all persons or entities injured abroad from recovering under the Sherman Act. *El Cid, Ltd. v. New Jersey Zinc Company,* 551 F.Supp. 626 (S.D.N.Y.1982) (Knapp, J.); *National Bank of Canada v. Interbank Card Association,* 507 F.Supp. 1113 (S.D. N.Y.1980) (Sand, J.), *aff'd,* 666 F.2d 6 (2d Cir.1981).

■ That STC neither claims to be selling its motor products in the United States nor suggests that it has ever sold or has made any specific plans to sell motors in the United States is irrelevant as long as Papst's alleged injurious conduct towards STC has an anticompetitive effect on United States commerce. STC asserts that because its manufactured motors are even-

tually sold in this country (presumably through K–G USA), Papst's course of conduct has a "direct, substantial and reasonably foreseeable effect on import trade in the United States." (*Memorandum in Opposition to Plaintiff's Motion under F.R. Civ.P. 12(b) to Dismiss STC's Antitrust Counterclaim* at 4). Because Papst's patent infringement claim outlines a close manufacture-sale-marketing nexus among STC, K–G Japan, and K–G USA, STC asserts that its motor sales are lost not in Japan, where the motors are sold to K–G Japan, but in the United States, the final sales destination point for STC manufactured motors that K–G Japan has resold to its subsidiary K–G USA. (*Id.* at 4).

Any effect in the United States of Papst's alleged conduct towards STC, however, would be, at most, de minimus. Papst's alleged restraint on STC in Japan cannot be said to have an anticompetitive effect upon United States commerce based upon K–G USA's later sale of STC manufactured motors in the United States, since jurisdiction over Sherman Act claims "is not supported by every conceivable repercussion of the action objected to on United States commerce." *National Bank of Canada, supra,* 666 F.2d at 8 (1981); *Eurim-Pharm v. Pfizer Inc.,* 593 F.Supp. 1102, 1104 (S.D.N.Y.1984) (Lowe, J.) (plaintiff failed to establish that defendants' alleged foreign price-fixing and market allocation scheme resulted in an anticompetitive effect on United States domestic or import commerce where "the transactions underlying this action and the effect of these transactions occurred solely within Europe, and the primary actors were European companies doing business solely within Europe."); *cf. Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 993 (2d Cir.1975) ("antifraud provisions of the federal securities laws ... [d]o not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses.")

The effects of the plaintiff's alleged antitrust activities occur solely in Japan where STC sells the motors at issue to K–G Japan. Accordingly, STC cannot rely on cases where defendants conspired to control some specific business activity within the United States or had cut off the importation into the United States of specifically designated goods. *See, e.g., Timberlane Lumber Company v. Bank of America,* 549 F.2d 597, 603, (9th Cir.1976) (plaintiffs, an Oregon partnership principally involved in the purchase and distribution of lumber within the United States, and its Honduran subsidiaries which milled lumber in Honduras and exported it to their parent corporation in the United States, alleged that defendants—located in both the United States and in Honduras—conspired to prevent plaintiffs from exporting Honduran lumber to the United States, thus directly and substantially affecting the foreign commerce of the United States); *Industrial Investment Development Corp. v. Mitsui & Co.,* 671 F.2d 876 (5th Cir.1982) (defendant was alleged to be an American company engaged in importing lumber into the United States which had conspired to prevent another American company from competing with it).

STC does not allege that Papst's conduct has prevented the import of foreign manufactured electric motors for use in computer disc direct drives or prevented companies other than Papst from manufacturing and selling the motors in the United States. Instead, STC has only alleged that it has suffered a loss of sales for its products. Finding STC's counterclaim fatally defective, the motion to dismiss for lack of subject matter jurisdiction is granted.

## 2. The Basic Elements of an Antitrust Cause of Action Based Upon Fraud On the Patent Office

K–G USA's counterclaim is based upon *Walker, supra,* in which the Supreme Court held that the knowing and willful misrepresentation of relevant facts to the Patent Office would not only invalidate a patent, but might also violate Section 2 of the Sherman Act. To recover under *Walker,* defendant must prove that: (1) the pat-

ents at issue were procured by knowing and willful fraud practiced by Papst on the Patent Office, and (2) all of the elements necessary to establish a Section 2 violation are present. *Id.* 382 U.S. at 175–78, 86 S.Ct. at 349–51.

*Walker* and its progeny emphasize that to sustain K–G USA's antitrust counterclaim, "deliberate fraud" is required: "there must be allegations and proof of knowing, willful and intentional acts of misrepresentation to the Patent Office. Furthermore, the misrepresentation must be material … it must be averred and shown that the patent would not have issued but for the fraud." *Erie Technological Products v. JFD Electronics Components*, 198 USPQ 179, 185 (E.D.N.Y.1978).

Despite Papst's blanket assertion that K–G USA has not pleaded fraud claims with sufficient particularity, Papst concedes that the fraud allegation with respect to patent 897 is specific. (*Papst's Memorandum of Law in Support of Its Motion Under 12(b) to Dismiss K–G USA's Antitrust Counterclaim* at 2). K–G USA alleges that "the failure of the patent attorney to bring the Brailsford '637 patent to the attention of the Examiner in charge, shows an intent to mislead the Examiner, and an intent to misrepresent the actual prior art that existed at the time … [and that] the Examiner would not have allowed the '897 patent to issue had the Examiner considered the Brailsford '637 patent at the time." (*K–G USA's Counterclaim* ¶ 26).[3] These allegations sufficiently inform Papst of the prior art upon which defendant predicates its attack on patent 897; moreover, they state the materiality of the nondisclosed information.

Regarding Papst's prosecution of the 542 patent application, K–G USA specifically

identifies patent 897, also in suit here, as the "prior art" which Papst allegedly "by and through its patent attorney, knowingly and willfully mischaracterized." (*K–G USA's Counterclaim* ¶ 29). K–G USA asserts that such mischaracterization and misleading arguments submitted in the 542 patent application show an intent both to mislead the Examiner and to misrepresent the prior art, and, that but for those arguments, the Examiner would not have allowed the 542 patent to issue.

K–G USA specifically identifies papers and language where mischaracterization occurred: an amendment dated November 21, 1983, a supplemental amendment dated November 25, 1983, and language that was added to the original claim 14 (which became claim 1 of the 542 patent) which allegedly copied the wording of patent 897's structure and operation. (*Id.* at ¶ 29).

In *Horwitt v. Movado Watch Agency, Inc.*, 364 F.Supp. 687, 690–91 (S.D.N.Y. 1973) (Lasker, J.), the court held the counterclaims sufficient to inform the licensor of the alleged prior art and the way in which he was said to have committed a fraud upon the United States Patent Office where the prior art was identified as to the date and time of use, patent number, and designer's name. We find the counterclaim as to fraudulent procurement of patent 542 sufficient to withstand the motion to dismiss.

■ However, as to patent 263 defendant vaguely asserts that Papst withheld relevant and material information "about pertinent prior art affecting the patentability and validity of said Letters Patent, and … knowingly and willfully present[ed] false and/or misleading arguments and ma-

---

**3.** Paragraph 26 of K–G USA's counterclaim specifically alleges the following withholding of prior art:

Papst, by and through its patent attorney, knowingly and willfully withheld from the Examiner handling the '897 patent application an extremely pertinent and material prior art reference, namely Brailsford U.S. Patent No. 2,457,637, in a lengthy paper filed with the Patent and Trademark Office … in connec-

tion with the prosecution of the '897 patent application. The patent attorney knew of the existence of the Brailsford '637 patent because he had had an interview with another examiner on April 23, 1974 in connection with a companion patent application of the assignee Papst. In an amendment filed by the patent attorney on June 3 in the companion application, the Brailsford '637 patent was discussed.

terials during the prosecution of the application which resulted in said patent, and in so doing perpetrated a fraud on that Office...." (*K–G USA's Counterclaim* ¶ 27). These conclusory statements, which fail to state the circumstances constituting the fraud with any particularity, are inadequate. *Erie Technological Products v. JFD Electronic Components, supra,* 198 USPQ at 186.

### 3. *The Other Necessary Elements of a Section 2 Claim*

Even if K–G USA's counterclaim of fraudulent procurement is sufficient as to two of the patents at issue, the counterclaim cannot survive a motion to dismiss unless all the other elements of a Section 2 case are sufficiently alleged as well. *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 993, n. 13 (9th Cir.1979). The Supreme Court in addressing this issue in *Walker* emphasized that an antitrust claim must demonstrate the patentee's possession of exclusionary power within the relevant market, i.e. defendant here must allege the relevant market for the products involved, the dominance of the patented devices therein, and the injurious consequences to defendant of Papst's patent enforcement. No liability can ensue until these indicia of an antitrust violation are established.

*Walker* announced that the monopoly power of a patented device means power to control prices or exclude competition in a relevant market; hence, "without a definition of that market there is no way to measure ... [defendant's] ability to lessen or destroy competition. It may be that the [patented] device ... does not comprise a relevant market. There may be effective substitutes for the device which do not infringe the patent." 382 U.S. at 178.

The United States Supreme Court has defined the relevant market under a Section 2 violation in terms of "both [its] geographic and ... distributive significance ... it includes any portion of the United States and any one of the classes of things forming a part of interstate or foreign commerce." *Standard Oil Co. v. United States,* 221 U.S. 1, 61, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). Paragraph 31 of defendant's counterclaim alleges that Papst's actions have resulted in "a restraint of trade or an exclusionary impact in the relevant market." Defendant merely posits the relevant market to be "the manufacture, sale and distribution of single phase Hall effect generator-controlled brushless DC electric motors for use in computer disc direct drives." (*K–G USA's Antitrust Counterclaim* at ¶ 32). K–G USA fails to define a relevant geographic market for the patents at issue and the proportionate power of Papst in that market. It has merely alleged in conclusory legal terms the existence of a monopoly. Although special pleading is not required in antitrust cases, 9 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 105.02[6], a short and plain statement of the claim requires more than the mere pleading of the statutory words. *See, e.g., Klebanow v. New York Produce Exchange,* 344 F.2d 294, 299–300 (2d Cir.1965) ("a mere allegation that defendants violated the antitrust laws as to a particular plaintiff and commodity [does not] compl[y] with Rule 8....").

In *Rios v. Marshall,* 530 F.Supp. 351, (S.D.N.Y.1981) (Gagliardi, J.) the district court dismissed plaintiffs' Sherman Act claim for failure to allege that the defendants possessed monopoly power in any relevant market. Although the plaintiffs in that case claimed that defendants had conspired to monopolize the New York apple harvest job market, they failed to allege "what proportion of any relevant employer market is controlled by the New York apple defendants, or how defendants have either excluded competitors or controlled the job offers of other employers." *Rios v. Marshall, supra,* 530 F.Supp. at 357 n. 4.

Similarly, in *El Cid, LTD v. New Jersey Zinc Company,* 551 F.Supp. 626 (S.D.N.Y. 1982) (Knapp, J.), a gold mining antitrust case, the plaintiff contended that the relevant market was both the gold mining and mining equipment industries. The court dismissed the antitrust claim, citing plain-

tiff's failure to define the relevant geographic market: "Neither side ... has provided us with any information about the gold market, the gold mining industry, or the mining equipment·industry. In particular ... no information on how or where gold is sold in Bolivia or world-wide; how far afield mining operators generally look for mining equipment, and what governs its selection; what percentage of world-wide or even national production of gold the Bolgol is capable of supplying; and what percentage of world-wide or other sale of mining equipment an operation of the Bolgol's projected size might reasonbly be expected to require." *El Cid, LTD v. New Jersey Zinc Company, supra,* 551 F.Supp. at 632.

In the instant case, the relevant product is brushless DC electric motors for use in computer disc direct drives. Neither side has furnished the court with any information about the size of the brushless electric motor market, the availability of substitute products,[4] or the portion of the relevant market allegedly dominated by each of Papst's patents. We need not examine the counterclaim to determine whether it is similarly deficient in other Section 2 requirements, the instant deficiency requires the court to dismiss K–G USA's antitrust counterclaim.

If its Section 2 Sherman Act claim is dismissed, defendant's claim for treble damages under Section 4 of the Clayton Act must fail since that section merely authorizes recovery of treble damages for violations of other provisions of the antitrust laws, and cannot serve as the basis of an independent claim for relief. *Rios v. Marshall, supra,* 530 F.Supp. at 358 n. 4.

### B. *Disqualification Motion*

■ Papst has moved to disqualify the law firm of Welsh & Katz, Ltd. ("Welsh & Katz"), which represents defendant STC, alleging that ten attorneys of that firm "switched sides" in their representation of the parties in this action. These ten attorneys, prior to February 1, 1983, were either partners or associates of the firm of Fitch, Even, Tabin and Flannery ("the Fitch firm"), which represents Papst in this action and has represented Papst since 1980. The four former partners who established Welsh and Katz in 1983 are: Donald L. Welsh, A. Sidney Katz, Roger D. Greer and Richard L. Wood. Katz and Greer are the individual trial counsel for STC in this action. The six former associates are: Jerald B. Schnayer, Eric C. Cohen, David H. Sitrick, Patrick G. Burns, Michael D. Rechtin and Steven R. Smith. Papst claims that these attorneys and their firm should be disqualified from representing STC because of confidences to which they may have been privy or had access, or because of the appearance of impropriety.

Although the Fitch firm has represented Papst since 1980, this account seems to have been handled primarily by Philip Watt, a Fitch partner. According to Watt's declaration, Watt traveled to Germany in November, 1982 and in January, 1983 "to discuss with Papst's management the infringement of Papst's patents by Shinano and Kanematsu." (*Memorandum in Support of Plaintiff's Motion to Disqualify,* Exhibit D, "Watt Declaration" at 2).

Papst alleges three contacts between former Fitch attorneys and Papst: a 45 minute conference between Welsh and Watt charged to "Consideration of Infringement by Matsushita Devices—Motor Principle"; passing comments by Schnayer which were neither billed to Papst nor considered by Watt to be work on Papst matters; and a brief meeting between Katz and Hans Dieter Papst. (*STC Memorandum in Opposition to Plaintiff's Motion To Dismiss,* Exhibit K, "Watt Deposition," at 489–91).

Papst asserts that on December 4, 1982, Watt had a 45 minute discussion with

---

**4.** The United States Supreme Court has defined the market for a product to determine control of price and competition as composed of "products that have reasonable interchangeability for the purposes for which they are produced— price, use and qualities considered." *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 394, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956).

Welsh concerning the advisability of instituting patent infringement actions on behalf of a German client against two Japanese manufacturers,—one of whom was STC—before the International Trade Commission ("ITC"). Watt sought Welsh's counsel because he had prior experience with ITC proceedings. The patents alleged to have been at issue are patents 263 and 542, both involved in this action. During the course of this 45 minute discussion, Watt declares that he gave Welsh confidential information concerning Papst, some of which was related to the present lawsuit, to enable Welsh to formulate a meaningful opinion. (*Memorandum in Support of Plaintiff's Motion To Dismiss*, Exhibit D, "Watt Declaration" at 4).

Welsh recalls that Watt spoke of a German company and its fan motors, but does not recall the identification of any Japanese company. The only information that Welsh says he was interested in or received from Watt was information regarding the German company's qualifications to sue in the ITC, and that he referred questions concerning such qualifications to Paul Plaia, an attorney in Washington, D.C. who specialized in ITC matters. (*STC's Memorandum in Opposition to Plaintiff's Motion to Disqualify*, Exhibit A, "Welsh Declaration" at 3). Welsh does not recall that Watt conveyed any details of the German client's business, such as present or future sales in the United States or elswhere, or any present or planned activity in the United States. (*Id.* at 4.)

Furthermore, Welsh's 45 minute conversation as shown by its timesheet entry was charged to the file entitled, "Consideration of Infringement by Matsushita Devices—Motor Principle" and not to the file that dealt with computer disc direct drive motors, the subject of this instant litigation. The former file pertains to a matter substantially unrelated to the present lawsuit. It involves different patents, different products, and different parties. (*STC's Memorandum in Opposition to Plaintiff's Motion to Disqualify* at 11–12).

Watt testified that while he may have solicited Schnayer's comments on Papst matters, "it would only be (sic) a very passing nature. And I am sure he did not charge time to it, so technically he did not work on the … client matter." (*STC Memorandum In Opposition to Plaintiff's Motion To Dismiss*, Exhibit K, "Watt Deposition" at 490). Schnayer, on the other hand, declares that while he was at the Fitch firm, he never discussed any Papst matter with anyone in the firm, never saw or reviewed any documents contained in any Papst's file, and never overheard any secrets or confidences of Papst. (*STC's Memorandum In Opposition to Plaintiff's Motion to Disqualify*, Exhibit E, "Schnayer Declaration" at 2).

Although Hans Papst, manager of the patent department at Papst, visited the Fitch office in Chicago in February 1981 to seek advice concerning possible suits against Japanese manufacturers and had a brief conversation with Katz, Papst does not remember if he named STC. (*Memorandum in Support of Plaintiff's Motion to Disqualify*, Exhibit E, "Papst Declaration" at 2). Moreover, Katz characterized the brief conversation—the only occasion Katz met or spoke to Papst—as " 'small talk' and a courteous greeting" in which he "engaged Mr. Papst in some conversation for a brief time, sufficient to avoid being curt or impolite", but terminated the meeting after about five to ten minutes to leave for his train. (*STC Memorandum in Opposition to Plaintiff's Motion to Disqualify*, Exhibit B, "Katz Declaration" at 2). It appears to have been a common practice for Watt, who regularly received visits from foreign patent attorneys visiting Chicago, to show them around the office and introduce them to the attorneys present. Watt introduced Katz to Papst as a "Japanese expert," which Katz understood to be a "facetious reference" to the fact that he had just recently visited Japan. (*Id.* at 2). Katz relays the gist of his meeting with Papst as follows:

> I told him briefly of some of my general experiences in connection with my dealing with the Japanese from my recent

business trip to Japan in late 1980, where I had spoken at a meeting of video game manufacturers about copyright law. He said that he was working on a patent matter with Mr. Watt that related to a Japanese company. He did not disclose the name of the Japanese company to me, nor did he disclose the particular subject matter about which he was concerned. He did not identify any patents to me, nor provide any information about any products other than that his company was involved with fans or fan motors. Mr. Papst did not disclose any other information to me ... I treated the visit as merely a brief courtesy, and certainly not as any substantive or billable matter. (*Id.* at 2–3). Watt admits that except for this one meeting with Papst, Katz did not work on or bill time to any Papst matter. (*STC Memorandum in Opposition to Plaintiff's Motion to Disqualify*, Exhibit K, "Watt Deposition" at 490–91).

The remaining attorneys who departed from the Fitch firm also claim never to have examined any Papst file. In fact, Watt testified he had no knowledge that any of the ten lawyers had ever "looked at or had possession of any document" in any Papst file. (*Id.* at 305–07). Yet Papst alleges that at firm luncheons and at other informal gatherings some of these lawyers would ask questions about Papst's products, patents and sales, including the motors that are the subject of two of the patents in the suit. (*Memorandum in Support of Plaintiff's Motion To Disqualify*, Exhibit D, "Watt Declaration" at 5). This unsupported allegation contradicts the recollections of the departing attorneys who claim never to have discussed or received any confidential information concerning Papst during any luncheon meeting or at any other time or to have discussed STC with anyone in the Fitch firm. (*See STC's Memorandum in Opposition to Plaintiff's Motion to Disqualify*, declarations, Exhibits A–J).

Federal district courts may disqualify attorneys where necessary to preserve the integrity of the adversary process. *Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241 (2d Cir.1979). Disqualification is appropriate where: "(1) an attorney's conflict of interest in violation of Canons 5 and 9 of the Code of Professional Responsibility [5] undermines the court's confidence in the vigor of the attorney's advocacy, *see, e.g., Fund of Funds, Ltd. v. Arthur Anderson & Co.*, 567 F.2d 225 (2d Cir.1977); *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir.1976); or (2) the attorney is at least potentially in a position to use privileged information concerning an opposing party through prior representation, in violation of Canons 4 and 9, thus giving his present client an unfair advantage." *See, e.g., Fund of Funds, Ltd. v. Arthur Anderson & Co., supra; Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir.1973).

■ Canon 4 provides: "A lawyer should preserve the confidences and secrets of a client." Canon 9 also cautions that "A lawyer should avoid even the appearance of professional impropriety." To ensure faithful adherence to these principles, the Second Circuit has held that an attorney may be disqualified from representing a client in a particular case if:

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir.1983). *See, Cheng v. GAF Corp.*, 631 F.2d 1052, 1055–56 (2d Cir.1980), *judgement vacated on other grounds*, 450

U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981); *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 570–71 (2d Cir.1973).

The Second Circuit adheres to the "substantially related" test enunciated by Judge Weinfeld in *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F.Supp. 265, 268 (S.D.N.Y.1953): "where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation, the latter will be prohibited." As to proof, Judge Weinfeld continued: "the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client." *Id.* at 268. Disqualification cases and the Canons on which they are based are intended to protect the confidences of former clients. To disqualify the ten attorneys and the Welsh and Katz law firm where there is little likelihood that confidences were disclosed would go far beyond that purpose.

Disqualification has been granted where the attorney switched sides and the prior and subsequent cases contained issues or client matter that were identical or essentially the same. *See, e.g., NCK Organization Ltd. v. Bregman*, 71 F.R.D. 338 (S.D.N.Y.) (Motley, J.) *aff'd*, 542 F.2d 128, 133–34, (2d Cir.1976); *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 753 (2d Cir.1975); *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir.1973); *Motor Mart, Inc. v. Saab Motors, Inc.*, 359 F.Supp. 156, 157 (S.D.N.Y.1973) (Pollack, J.).

It seems clear that the "small talk" meeting between Katz and Papst could not be said to have involved a matter substantially related to the present lawsuit. Nor are the passing comments allegedly solicited from Schnayer, which Schnayer denies, "substantially related" to the present litigation.

However, even if the court determines that the patent issues pertaining to Papst handled by the Fitch firm before the Welsh and Katz firm was established and the patents involved in the present action are substantially related, the court must still determine whether the departing attorneys' involvement in the Papst decision to bring patent infringement claims against certain Japanese corporations was such that they would be considered counsel for Papst with access to privileged information. *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 740 (2d Cir.1978).

■ To disqualify an attorney a court need not require proof that he or she actually had access to or received privileged information while representing the client in a prior case. Such a requirement, it has been said, "would put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether." *Id.* at 740. *In Cook Industries*, however, it was evident that the attorney representing the Government of India had been deeply involved in soybean litigation on behalf of Cook in prior litigation posing identical issues. Thus the court found he had been privy to confidential information concerning Cook. Moreover, during three years as an associate, the attorney had billed Cook for more than one hundred hours of his services, had prepared answers to the complaints against Cook, and researched various memoranda in support of numerous motions on behalf of Cook. He also interviewed witnesses, and attended several pretrial conferences and one settlement conference. The fact that the attorney was only an associate was deemed immaterial by the court, since he was in "day-to-day charge of the cases" and "no assertion is made to the contrary." *Government of India v. Cook Industries, Inc.* 422 F.Supp. 1057, 1059 n. 2.

In *Silver Chrysler, supra*, the Second Circuit affirmed the district court holding that an attorney representing an automobile dealer was not disqualified by reason of having once been an associate of an 80-member firm that represented the manufacturer, where the attorney's prior in-

volvement with matters concerning the manufacturer was limited to briefs, informal discussions on procedural matters or research on specific points of law, and the attorney was not entrusted with relevant client confidences.

Papst here lists Watt's trips to Germany and his various contacts with Papst, but fails to show that any of his colleagues was involved in any Papst matters. Although an attorney's former law firm may have pervasive contacts with a particular client, an attorney's relationship cannot be considered co-extensive with that of his firm. *Silver Chrysler, supra,* 518 F.2d at 756. The fact that Walsh and Katz were both partners with the Fitch firm is not determinative; the Second Circuit looks at involvement, not status. There is "reason to differentiate for disqualification purposes between lawyers who become heavily involved in the facts of a particular matter and those who enter briefly on the periphery for a limited and specific purpose relating solely to legal questions." *Silver Chrysler, supra,* 518 F.2d at 756. Although it is usually partners who are heavily involved, and associates who are limited to the periphery, the Second Circuit recognizes that young attorneys can become important figures in certain matters, *Cook Industries, supra.* Conversely, the mere fact that four of the attorneys sought to be disqualified in the instant case were partners in the Fitch firm does not necessarily mean that the work performed, if any, by these partners on the Papst case was other than of a limited, non-confidential nature.

Welsh here had only the most peripheral contact with this case, spending approximately 45 minutes to offer procedural advice to Watt regarding the requirements for bringing a suit before the ITC. Watt's declaration that Welsh received confidential information is phrased largely in conclusory terms, and Watt does not point to billed hours, or seen documents, or any other activity that would lead the court to hold that Welsh's role constituted "representation" within the meaning of *T.C. Theatre Corp., supra,* and cognate cases.

The court also refuses to disqualify these attorneys on the basis that their representation of STC would result in an appearance of impropriety. The Second Circuit pragmatically explains why a client of a large law firm cannot reasonably expect to foreclose either all lawyers formerly at the firm or even those who have represented it on unrelated matters from subsequently representing an opposing party:

It is unquestionably true that in the course of their work at large law firms, associates are entrusted with the confidences of some of their clients. But it would be absurd to conclude that immediately upon their entry on duty they become the recipients of knowledge as to the names of all the firm's clients, the contents of all files relating to such clients, and all confidential disclosures by client officers or employees to any lawyer in the firm. Obviously such legal osmosis does not occur.... [A] rational interpretation of the Code of Professional Responsibility does not call for disqualification on the basis of such an unrealistic perception of the practice of law in large firms.

*Silver Chrysler, supra,* 518 F.2d at 753–54. Although Canon 9 dictates that doubts should be resolved in favor of disqualification, *Hull v. Celanese Corporation,* 513 F.2d 568, 571, (2d Cir.1975), it is not intended to override the delicate balance created by Canon 4 and the decisions thereunder.

The reluctance to disqualify attorneys is rooted in the immediate adverse effect that disqualification has on the client by separating him from counsel of his choice, and the tactical reasons often involved in disqualification motions. *See Allegaert v. Perot,* 565 F.2d 246, 251 (2d Cir.1977). Even when made in good faith, such motions cause delay. Accepting the need for efficient judicial administration, but also recognizing the potential advantage of immediate preventive measures, the Second Circuit has held that unless an attorney's conduct tends to "taint the underlying trial" by violating Canon 4, 5, or 9,

see *W.T. Grant Co. v. Haines*, 531 F.2d 671, 678 (2d Cir.1976), courts should be quite hesitant to disqualify an attorney.

Based upon the declarations, depositions, and memoranda of law submitted by the parties, the court denies the disqualification motion.

STC's motion to compel the attendance of Hans Dieter Papst at a deposition and in the alternative to strike his declaration on matters pertaining to the disqualification motion is denied. Papst's motion to strike STC's supplemental memorandum in opposition to plaintiff's motion to disqualify and the motion to file a surreply memorandum are also denied.

IT IS SO ORDERED.